UNITED STATES of America
v.
Athanasios THEODOROPOULOS,
a/k/a "Tommy".

Appeal of Athanasios
THEODOROPOULOS.

UNITED STATES of America
v.
George KARIVALIS, a/k/a "Papou".

Appeal of George KARIVALIS.

UNITED STATES of America
v.
Jimmy PEETROS, Appellant.

UNITED STATES of America
v.
John BOURZIKOS, Appellant.

UNITED STATES of America
v.
Constantinos TSOKAS, a/k/a "Gus".

Appeal of Constantinos TSOKAS.

UNITED STATES of America
v.
Nestor BARRERA, Appellant.

UNITED STATES of America
v.
Dimitrios ARGIRIS, a/k/a "Angelo".

Appeal of Dimitrios ARGIRIS.

UNITED STATES of America
v.
Haralambos TRELOPOULOS,
a/k/a "Charlie".

Appeal of Haralambos TRELOPOULOS.

Nos. 88–1259 through 88–1265, 88–1273.

United States Court of Appeals,
Third Circuit.

Argued Oct. 20, 1988.

Decided Jan. 17, 1989.

Rehearing and Rehearing In Banc
Denied Feb. 7, 1989 in Nos.
88–1260 and 88–1262.

Rehearing and Rehearing In Banc Denied
Feb. 14, 1989 in Nos. 88–1259,
88–1261, 88–1264, 88–1273.

Christopher G. Furlong, Broomall, Pa., for Athanasios Theodoropoulos appellant in No. 88–1259.

Milton Grusmark (Argued), Robert F. Simone, Philadelphia, Pa., for George Karivalis, appellant in No. 88–1260.

James D. Crawford (Argued), Philadelphia, Pa., for Jimmy Peetros, appellant in No. 88–1261.

Milton Grusmark (Argued), Louis T. Savino, Jr., Philadelphia, Pa., for John Bourzikos, appellant in No. 88–1262.

John E. Riley, Philadelphia, Pa., for Constantinos Tsokas, appellant in No. 88–1263.

Frank De Simone, Philadelphia, Pa. (argued), for Nestor Barrera, appellant in No. 88–1264.

Dennis H. Eisman, Philadelphia, Pa. (argued), for Dimitrios Argiris, appellant in No. 88–1265.

Frank H. Sherman, Philadelphia, Pa. (argued), for Haralambos Trelopoulos, appellant in No. 88–1273.

Thomas Booth (Argued), for appellee.

Before SLOVITER and HUTCHINSON, Circuit Judges and GERRY, District Judge *

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

Athanasios Theodoropoulos and seven co-defendants appeal following their conviction of conspiracy to distribute cocaine in violation of 21 U.S.C. § 846 (1982) and various additional narcotics-related charges. Theodoropoulos and Constantinos Tsokas were also convicted of two counts each of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (1982). Tsokas and George Karivalis were convicted of one count each of distribution of cocaine in violation of 21 U.S.C. § 841(a)(1). Haralambos Trelopoulos, Angelo Argiris, Nestor Barrera, John Bourzikos, and Jimmy Peetros were convicted on various counts of using a telephone to further the conspiracy in violation of 21 U.S.C. § 843(b) (1982). Finally, Trelopoulos was convicted on one count of possession of an unregistered firearm in violation of 26 U.S.C. § 5861(d) (1982) and one count of using a firearm to further a drug traffick-

---

* Hon. John F. Gerry, Chief Judge of the United States District Court for the District of New Jersey, sitting by designation.

ing offense in violation of 18 U.S.C. § 924(c)(1) (Supp.1986). Rolando Ramos, John Makris, and John Pappas, co-defendants at trial, were acquitted of all charges.

The eight appellants raise numerous issues but those we consider most significant relate to the admissibility and scope of expert testimony on allegedly coded conversations and the nature of evidence which can support a conviction for use of a firearm in the course of a drug trafficking offense.

## I.

### Introduction

### A.

### Background

The FBI investigation of Theodoropoulos' drug related activities began in 1985. Based on information received via court-authorized electronic surveillance of the telephone in Theodoropoulos' apartment and other physical surveillance, the government applied for, and received, a warrant to search the apartment frequented by Trelopoulos and Theodoropoulos, among others, for cocaine and related paraphernalia. Theodoropoulos, Trelopoulos, Dimitra (Gina) Gakis (Theodoropoulos' girlfriend), and Jimmy Kotopoulos were present in the apartment during the search on April 3, 1987. The agents seized cocaine and money found in Trelopoulos' pockets, and cocaine found in a metal box belonging to Trelopoulos. The agents also seized a loaded shotgun found in the apartment, and three handguns (two loaded pistols and a disassembled machine pistol which had been altered to fire automatically) and ammunition found in a trash can on the apartment's back porch.

### B.

### The Trial

The government's case at trial consisted primarily of the testimony of Robert Watts, a friend of Theodoropoulos turned

government informant, Gina Gakis, who testified under a grant of immunity, Valerie Townes, a drug courier for one of Theodoropoulos' suppliers, and Arthur Eberhart, the government's expert witness. Much of the evidence consisted of transcripts of the intercepted conversations, some translated from the Greek, which the government contended consisted of coded references to drugs and drug transactions.

Eberhart is an FBI special agent trained in cryptanalysis (code breaking) and the examination of illicit business records. On the basis of his analysis of the transcripts,[1] Eberhart testified that appellants used terms such as clothes, steaks, televisions, furniture, cars and statues, among others, as coded references to drugs. He further testified that references to street numbers specified quantities of drugs to be picked up or delivered, and that references to money in multiples of 28 referred to grams of cocaine. This testimony was corroborated by the testimony of Gakis and Watts, who also described Theodoropoulos' use of codes to conceal the drug related nature of many of his conversations held in their presence.

In addition to identifying and translating the coded conversations, Eberhart was asked to, and did, express an opinion, over defense objection, as to the nature of the business being transacted in the conversations, and the role of each of the defendants in that business. Eberhart testified that Theodoropoulos was the manager or supervisor of a drug distribution business; that Karivalis and Barrera were suppliers of drugs; that Peetros both supplied and distributed drugs; and that Trelopoulos, Bourzikos, and Makris were drug distributors. Eberhart could not identify a set role for Tsokas, but said that on at least one occasion, Tsokas had acted as a broker to set up a deal with one Stavros Katsis. Eberhart did not identify any role for Pappas, but testified merely that he participated in the deal involving Katsis. Finally, Eberhart testified that he could not reach a

---

1. Eberhart apparently had independent knowledge that the investigation involved a narcotics ring.

definite conclusion concerning the roles of Argiris or Ramos.

## II.

### Discussion

### A.

### Admission of The Expert Testimony

Appellants, except Argiris, challenge the admission of Eberhart's testimony on a variety of grounds. We review the trial court's decision for abuse of discretion.

#### 1. The Expert's Use of Transcripts not in Evidence

■ Appellants object to the admission of Eberhart's testimony because his conclusions were based in part on transcripts not placed in evidence. Rule 703 of the Federal Rules of Evidence explicitly permits an expert to base his or her opinions on facts not in evidence. Although appellants argue that Rule 703 envisions utilization of out-of-court evidence as background material merely and not as evidence that is central to the expert's opinion, the Rule itself makes no such distinction. It provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing." Fed.R.Evid. 703.

The Advisory Committee Notes explain that in addition to the existing practice under which experts based their opinions on firsthand observation and presentation at the trial, the Rule added as a source for such expert opinions the "presentation of data to the expert outside of court" in order "to broaden the basis for expert opinions beyond that current in many jurisdictions." In light of the intent of the Rule "to bring the judicial practice into line with the practice of the experts themselves when not in court" and the Advisory Committee's illustration of a physician "bas[ing] his diagnosis on information from numerous sources and of considerable variety," we reject the limiting construction appellants would have us apply to Rule 703. Advisory Committee Notes to Fed.R. Evid. 703.

Of course, as the Rule makes clear, the facts or data which the expert may use must be of a type "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed.R.Evid. 703. There is no question that the material relied on by Eberhart, which consisted exclusively of coded conversations, is the type of data on which cryptanalysts must rely in making their inferences, and thus satisfies this requirement of the Rule.

Defendants argue that they were prejudiced because the jury knew that there were tapes that had not been introduced and could have speculated that there were numerous inculpatory conversations in addition to those in evidence. Copies of all the transcripts were made available to defendants, and they were permitted to listen to and copy any tapes in addition to those copied for them which they deemed useful. Defendants do not contend that they were barred from introducing any transcripts which they deemed relevant. They took advantage of their right under Fed.R.Evid. 705 to cross-examine Eberhart concerning the basis for his opinion by confronting him with the unadmitted transcripts. The court instructed the jury to consider only the material in evidence. There is no reason to believe the jury would not have inferred that the unadmitted materials contained no inculpatory evidence, particularly since defendants were free to argue before the jury, and in fact one did, that the government presented a distorted picture by using only some of the numerous recorded conversations. App. at 1529. Therefore we reject the claim that Eberhart's testimony was inadmissible because some of the transcripts on which it was based were not offered into evidence by the government.

#### 2. The Expert's Testimony as to an Ultimate Issue

■ Other than a somewhat vague challenge to Eberhart's expertise made by some defendants, there is no challenge to the ruling permitting Eberhart to testify concerning the meaning of the coded con-

versations. This is the paradigm situation for expert testimony under Rule 702. *See United States v. Rollins,* 862 F.2d 1282, 1292 (7th Cir.1988); *United States v. Kusek,* 844 F.2d 942, 949 (2d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 157, 102 L.Ed.2d 128 (1988); *see also United States v. Samuels,* 741 F.2d 570, 574 (3d Cir.1984) (discussion of expert testimony interpreting drug jargon). Otherwise, by the simple expedient of eliminating reference to drugs, those engaged in narcotics traffic could effectively avoid prosecution based on their conversations while conducting such traffic.

Here, however, Eberhart's testimony went beyond the translation of the code words and a description of how a narcotics organization works, and instead included his conclusions as to the roles played by the individual defendants.

Nonetheless, it is not a valid objection, as some defendants argue, that Eberhart's conclusions pertain to an ultimate issue in the case. Rule 704 provides that opinion testimony "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact," Fed.R.Evid. 704(a), although it does preclude an expert's opinion or inference "as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto," Fed.R.Evid. 704(b).

While the distinction may appear to be a fine one, the Advisory Committee explained that the thrust of the Rule is to abandon the restriction precluding witnesses from expressing opinions, even on the ultimate issue, as long as the opinions meet the helpfulness requirement. Thus, in a case similar to this, the court held that expert testimony that a defendant was a "steerer" in a drug organization was admissible, *United States v. Brown,* 776 F.2d 397, 400–02 (2d Cir.1985), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986). On the other hand, an expert's repeated testimony that defendants had engaged in "fraudulent, manipulative practices" was improper under Rule 704, not because it represented an ultimate factual conclusion but because the testimony was based on " 'inadequately explored legal criteria.' " *United States v. Scop,* 846 F.2d 135, 139–42 (quoting Advisory Committee Notes to Rule 704), *rev'd in part on other grounds on reh'g,* 856 F.2d 5 (2d Cir.1988). Eberhart's conclusions of the roles played by the defendants in the drug distribution business do not fall within the narrow range of opinions still prohibited under Rule 704. Indeed, they could be viewed instead as factual conclusions rather than opinions. In any event, they were not inadmissible under Rule 704.

### 3. *Helpfulness of the Expert Testimony*

The overriding limitation on expert testimony is the requirement that "[u]nder Rules 701 and 702, opinions must be helpful to the trier of fact." Advisory Committee Notes to Fed.R.Evid. 704. Defendants argue that once Eberhart had decoded the transcripts, the jury was fully capable of deciding for itself what role, if any, each defendant played in the conspiracy. They claim such testimony was inadmissible under our recent decision in *United States v. Dicker,* 853 F.2d 1103 (3d Cir.1988).

*Dicker* did not deal with ascribing roles to members of an illegal narcotics conspiracy. In that case, we held that the portion of the testimony of a United States Customs Service undercover agent that conversations he had with the defendant related to procurement of "phony" paperwork in connection with a conspiracy to export defense articles should not have been permitted because the witness' interpretations of what he said and what the defendant said did not meet the helpfulness standard for lay opinions under Rule 701.

Aside from the distinction between the traditionally broader admissibility granted expert opinion testimony, and that permitted opinion testimony by lay witnesses under Fed.R.Evid. 701, *Dicker* is inapposite because the conversations which the witness was permitted to interpret were clear. We held that therefore it was improper for the agent to "ascribe[ ] his own illicit meaning to straightforward, potentially legitimate statements." *Id.* at 1110.

There is undoubtedly some risk that permitting an expert to testify concerning a defendant's role in a drug operation may, as Judge Friendly noted in a similar case, be overly persuasive to the jury because of the "aura of special reliability and trustworthiness" surrounding expert testimony. *See Brown,* 776 F.2d at 401 & n. 6 (citing *United States v. Young,* 745 F.2d 733, 765–66 (2d Cir.1984) (Newman, J., concurring), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985)). Nonetheless, even in *Brown* the court held that it was not error to admit the officer's conclusion as to defendant's role in the organization. Of course, such testimony should not be routinely admitted. The dispositive question in each such case is whether the testimony will be helpful to the jury or unduly prejudicial under Rule 403.

In dealing with organized crime or illegal narcotics operations, a lay jury is unlikely to have knowledge as to the structure of the organization or the interrelationships between the participants. We have previously held admissible testimony as to the structure of organized crime families and explanations of Italian words such as *capi* and *consigliere* in the context of an organized crime family. *United States v. Riccobene,* 709 F.2d 214, 230–31 (3d Cir.), *cert. denied,* 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983). Here, the structure of the Theodoropoulos organization was complex, and there was confusion in the conversations between the participants created by their use of different codes, two languages, and truncated sentences. We have permitted even lay testimony of a witness' understanding of a tape recorded conversation when the language was "abbreviated, composed with unfinished sentences and punctuated with ambiguous references to events that [were] clear only to [defendant] and [the witness.]" *United States v. DePeri,* 778 F.2d 963, 977 (3d Cir.1985), *cert. denied,* 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986). The district court in its

discretion could reasonably have decided that Eberhart's testimony as to defendants' roles in the organization could have assisted the jury in making sense of otherwise incoherent phone conversations. *Accord United States v. Angiulo,* 847 F.2d 956, 974–75 & n. 23, (1st Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 138, 102 L.Ed.2d 110 (1988) (not an abuse of discretion for the trial judge to admit expert testimony concerning defendants' roles in organized crime family).[2]

In this case, the trial judge carefully instructed the jury that they were free to credit as much or as little of agent Eberhart's testimony as they saw proper. There is no evidence that Eberhart was explaining what were clear statements. On the contrary, because the code words are interwoven throughout the conversations, often in confusing contexts (for example, the reference to four "blue" steaks in a conversation between Theodoropoulos and Karivalis, App. at 1770) Eberhart's testimony was helpful in setting the stage for an understanding of the nature of Theodoropoulos' enterprise.

Finally, we cannot conclude in this case that the jury gave undue weight to Eberhart's characterization of defendants' roles. We note that the jury acquitted Makris despite Eberhart's testimony that Makris was "a distributor who received drugs from Mr. Theodoropoulos," App. at 332, and convicted Argiris despite Eberhart's inability to offer an opinion as to Argiris' role in the organization. We find no reversible error in the admission of Eberhart's testimony.

### B. THE SUFFICIENCY OF THE EVIDENCE CLAIMS

#### 1. *The Drug Charges*

■ Theodoropoulos, Trelopoulos, Peetros, Barrera, Argiris, and Tsokas contend that the evidence against them was insuffi-

---

**2.** The case on which defendants rely, *United States v. Arenal,* 768 F.2d 263, 269–70 (8th Cir. 1985), where the court held it was an abuse of discretion to have allowed a police officer to testify that cocaine came from a common source, i.e. the defendants, is inapposite. That case did not involve the use of code and hence the officer's conclusion was not one derived from his expertise in deciphering code, which is the rationale for permitting an expert's conclusion on the roles played by members of the defendant group.

cient to sustain their convictions. We review sufficiency of the evidence claims for substantial evidence that a rational trier of fact, viewing the evidence in the light most favorable to the government, could have found the essential elements of the charged crime beyond a reasonable doubt. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Messerlian*, 832 F.2d 778, 789 (3d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1291, 99 L.Ed.2d 501 (1988). We have examined the record and find sufficient evidence to support the convictions. We consider below only those claims that merit particular discussion.

The intercepted phone conversations, the testimony of Gakis, Townes, and Watts, and the FBI surveillance provided overwhelming evidence of a wide-ranging cocaine distribution operation working out of Theodoropoulos' apartment. Some of the defendants, however, allege a variance between the proof and the indictment, claiming that the government's proof was insufficient to establish the single, broad conspiracy charged in the indictment. They argue that, as in the classic case of *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), the government proved at most a series of separate conspiracies.

Under *Kotteakos*, such a variance is reversible error if it prejudiced some substantial right of the defendants. *Id.* at 752, 66 S.Ct. at 1241. Here the trial judge properly charged the jury that they could convict only if there was sufficient evidence that each conspirator participated in the broad conspiracy and the jury's guilty verdicts signify that they so found. The question before us then is whether there was sufficient evidence from which the jury could have reached this conclusion. *United States v. Smith*, 789 F.2d 196, 200 (3d Cir.), *cert. denied*, 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986).

There was evidence from which the jury could find, in the phone conversations decoded by Eberhart, that Theodoropoulos directed Karivalis to supply him with cocaine for resale and reported thereafter on the transactions, discussed cocaine dealings with Trelopoulos, negotiated with Peetros over the price of cocaine to be supplied by Peetros and thereafter complained about its form, complained to Barrera about the quality of cocaine supplied by the latter, set up a cocaine delivery to Katsis through Tsokas, and conducted cocaine transactions with Argiris for which Argiris paid him on an ongoing basis.

This court has previously held that drug conspiracies involving numerous suppliers and distributors operating under the aegis of a common core group can be treated as a single conspiracy. *See United States v. Adams*, 759 F.2d 1099, 1109–10 (3d Cir.), *cert. denied*, 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985). The government need not prove that each defendant knew all the details, goals, or other participants. *Id.* at 1114. In this case, as in *Adams*, there was sufficient evidence from which a jury could have concluded that each drug transaction was a step in achieving the conspiracy's common goal of distributing cocaine for profit. *Id.* at 1109–10.

The evidence linking Barrera to the conspiracy is less direct than it is with the other defendants. Barrera, who worked in an electronics store, vigorously argues that his recorded conversations with Theodoropoulos concerning television sets in fact were transactions for television sets, not cocaine. The jury, however, could have believed otherwise.

In the first recorded telephone conversation between Barrera and Theodoropoulos on January 6, 1987, Theodoropoulos expressed a desire to buy a television from Barrera. On January 9, 1987, they discussed Barrera's offer to sell Theodoropoulos a television set that was "a little bit over fifteen." App. at 2156. Thereafter, on January 14, 1987, Theodoropoulos relayed his client's displeasure with the quality of the "television" which Theodoropoulos had gotten from Barrera, saying "I wasn't too excited about uh about the TV the other day.... Because I thought, you know, that the pic eh the picture was clearer, you know, there's some kind of statics." App. at 2178. Barrera reassured Theodo-

ropoulos that he then had better quality televisions available.

Eberhart's testimony that the references to televisions were references to drugs is supported by the testimony of Barrera's employer that he did not stock a television that was "a little" over fifteen inches. App. at 1257. A jury crediting Eberhart's testimony, as it was entitled to do, could have concluded that these conversations related to a drug transaction in which Barrera supplied drugs to Theodoropoulos. The jury also could have deemed that this conclusion was supported by the circumstantial evidence that on January 9, 1987, the date of the second conversation, while Theodoropoulos was contemporaneously arranging a cocaine sale with Stavros Katsis and Tsokas, he went to Barrera's place of employment twice.

Even if Barrera had been only an occasional supplier, and did not himself know all the details, goals, or other participants of the broader conspiracy, the January 14 conversation concerning a third party's complaint about the quality of the cocaine supplied by Barrera is evidence of Barrera's knowledge that Theodoropoulos had distributed the drugs and Barrera's willingness to continue to provide cocaine to Theodoropoulos. This suffices to support a conviction of conspiracy on the ground that Barrera knew he was part of a larger drug operation. *See Adams*, 759 F.2d at 1114; *see also United States v. Samuels*, 741 F.2d 570, 575 (3d Cir.1984) (upholding conspiracy conviction on basis of two conversations which could be interpreted as establishing that one co-conspirator had arranged to have defendant pay another co-conspirator for drugs with money which defendant owed to that co-conspirator).

We have considered and reject the similar argument made by Tsokas, Peetros and Argiris that each was unaware of the broader conspiracy. The evidence was sufficient to support the jury's conclusion that each was aware that Theodoropoulos was the hub of a conspiracy involving persons other than themselves.

We also believe that the evidence supporting Argiris' conviction on one count of using a telephone to facilitate the conspiracy in violation of 21 U.S.C. § 843(b), while a close question, is sufficient. The transcript of the brief conversation between Argiris and Theodoropoulos on September 6, 1986, which is the basis of the indictment count, does not, on its face, contain any references to drug-related activity, nor does it appear to contain any coded references to drugs. Agent Eberhart was not able to testify on the basis of this transcript that Argiris had any role in the conspiracy. The conversation appears to be an attempt to set up a meeting between Argiris and Theodoropoulos and, when Argiris says, "[t]ell me did you get the [unintelligible]?", App. at 1772, suggests the existence of some transaction between the two.

The government charges in the indictment that this conversation was an attempt by Argiris to arrange payment of past cocaine debts to Theodoropoulos. Were this the only evidence the conviction on the facilitation count could not be sustained. However, the jury was not required to view this conversation in isolation.

Gakis testified that in August, 1986, she and Theodoropoulos picked up a plastic bag at a pizza parlor containing 10 or 12 "big packages of cocaine" and returned to Theodoropoulos' apartment. App. at 542. Theodoropoulos immediately called Argiris who came over and met privately with Theodoropoulos in the bedroom. After Argiris left, Gakis saw that only one package of cocaine was left in the plastic bag, and Argiris soon returned to the apartment and picked up that package. App. at 543. Gakis also testified that on September 7, 1986, the day after the conversation on which the government relies, Argiris left an envelope under the door of Theodoropoulos' apartment marked "Angelo 700." App. at 545. In a later recorded conversation on September 17, 1986 Theodoropoulos, patently perturbed, directed Argiris to deliver money to him because, in Theodoropoulos' words, "I owe the man $1,500.00, do you understand?" App. at 1881. A week later Theodoropoulos told Trelopoulos, as interpreted by Eberhart, that Trelopoulos should get drugs from Argiris.

App. at 270–71; 1969–70. On November 3, 1986 Theodoropoulos told Karivalis that he received an envelope under the door from Argiris with $250.00 and that Argiris would give him "something every week." App. at 2091–92. In the same conversation Theodoropoulos said that Argiris owed him $10,000.00. *Id.*

The jury could have construed the telephone conversation between Argiris and Theodoropoulos on September 6, 1986 as reflecting part of the ongoing relationship between Argiris and Theodoropoulos with respect to the sale of drugs and payment therefor. We thus reject each of the defendants' contentions that the evidence was insufficient to sustain their respective convictions related to the conspiracy and substantive drug charges.

2. *The Firearms Charges*

Trelopoulos was convicted of two firearm counts, one count of possession of an unregistered firearm in violation of 26 U.S.C. § 5861 (1982) (count 36) and one count of using a firearm during a drug trafficking offense in violation of 18 U.S.C. § 924(c) (Supp.1986) (count 35). The unregistered weapon that was the subject of count 36 was an automatic machine pistol which, when found during the search of the apartment, was disassembled [3] and in a trash can on a porch outside the apartment together with two other handguns and ammunition.

■ We reject Trelopoulos' claim that there was not sufficient evidence to support his knowing possession of the machine pistol. Although Trelopoulos argues that he was not the sole resident of the apartment, and that Gakis and Theodoropoulos often stayed at the apartment when Trelopoulos was not there, there was sufficient

evidence from which the jury could have concluded that Trelopoulos exercised sufficient dominion and control over the apartment to be in possession of weapons found on the premises. *See United States v. Miles,* 772 F.2d 613, 615 (10th Cir.1985); *United States v. Pritchard,* 745 F.2d 1112, 1124 (7th Cir.1984); *United States v. Scarfo,* 685 F.2d 842, 847 (3d Cir.1982), *cert. denied,* 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983). Moreover, since Gakis testified that Trelopoulos showed her a machine pistol at Theodoropoulos' apartment, the jury could have concluded that the machine pistol found in the trash can was the one which Trelopoulos had shown Gakis in Theodoropoulos' apartment. There is thus sufficient evidence to support the possession charge.

Trelopoulos' challenge to his conviction on the count charging use of a firearm during the commission of a drug trafficking offense is a more serious one. Section 924(c)(1) provides, in pertinent part:

Whoever, *during and in relation to any* crime of violence or *drug trafficking crime,* including a crime of violence or drug trafficking crime, which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device, for which he may be prosecuted in a court of the United States, *uses* or carries a *firearm, shall,* in addition to the punishment provided for such crime of violence or drug trafficking crime, *be sentenced to imprisonment for five years....*

18 U.S.C. § 924(c)(1) (Supp.1986) (emphasis added).

The indictment charged that Trelopoulos "did knowingly and willfully use" four firearms, i.e., a Remington shotgun and three handguns, "during and in relation to a drug trafficking crime ... that is, conspir-

---

**3.** The conviction is not precluded because the machine pistol was disassembled. Under 18 U.S.C. § 921(a)(3) (1982) a firearm is defined as "any weapon ... which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." Since it could have easily been made operable, the machine pistol is within the scope of 18 U.S.C. § 924(c). *See United States v. Harris,* 792 F.2d 866, 868 (9th Cir.1986). Similarly, a disassembled ma-

chinegun may give rise to a violation of 26 U.S.C. § 5861. 26 U.S.C. § 5845(b) (Supp.1986) (definition includes "any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person"). *See United States v. Shilling,* 826 F.2d 1365, 1367 (4th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 777, 98 L.Ed.2d 863 (1988).

acy to distribute and possess with intent to distribute cocaine." The evidence from the search established that the shotgun was found loaded inside the apartment while, as noted above, the three handguns and ammunition were found in the trash can on the porch, and one of the three, the machine pistol, was disassembled. There is no evidence that Trelopoulos fired any of these weapons, or that he used them to threaten anybody during the course of the conspiracy. Gakis testified that Trelopoulos once showed her a shotgun at his apartment, and told her to use it if anyone tried to get in. The government's contention is that the mere presence of the weapons in Trelopoulos' apartment, which the jury could have believed was a staging and storage area for drugs and drug paraphernalia, constituted use within the meaning of 18 U.S.C. § 924(c)(1).

It has been held that the weapon need not actually be handled or brandished to be "used" under the terms of section 924(c). *See, e.g., United States v. Mason,* 658 F.2d 1263, 1270–71 (9th Cir.1981) (holstered weapon next to defendant on seat of car during drug deal was "used" where defendant's presence was to provide protection for codefendant). As long as the government establishes some relation between the use alleged and the predicate offense, a conviction under the section can be upheld. *See United States v. Stewart,* 779 F.2d 538, 540 (9th Cir.1985), *cert. denied,* —— U.S. ——, 108 S.Ct. 192, 98 L.Ed. 2d 144 (1987) (firearm can be deemed "used" for purposes of section 924(c) where it has emboldened an actor "who had the opportunity or ability to display or discharge the weapon to protect himself or intimidate others, whether or not such display or discharge in fact occurred").

This court has not previously had occasion to consider the so-called "drug fortress" theory, on which the government relies here, pursuant to which the mere presence of weapons in the apartment used by the drug traffickers is sufficient to constitute use. *See United States v. Matra,* 841 F.2d 837, 841–43 (8th Cir.1988); *United States v. Grant,* 545 F.2d 1309, 1312–13 (2d Cir.1976), *cert. denied,* 429 U.S. 1103, 97

S.Ct. 1130, 51 L.Ed.2d 554 (1977) (decided before the statute contained the "in relation to" language). In both *Matra* and *Grant,* the principal resident of a fortified drug house was held to have possessed and used the weapons discovered therein on the theory that the availability of the weapons "increased the likelihood that the criminal undertaking would succeed." *Matra,* 841 F.2d at 843. The court explained that at least one of the guns " 'had undoubted utility in the protection of the valuable [cocaine] supply and of the cash on hand.' " *Id.* at 842 (quoting *United States v. LaGuardia,* 774 F.2d 317, 321 (8th Cir.1985)).

The *Matra* rationale was extended recently to a case where, although the premises were not a "drug fortress," agents found seven firearms, a quantity of cocaine in 444 capsules, and a small quantity of marijuana. *See United States v. Robinson,* 857 F.2d 1006, 1010 (5th Cir.1988). The court stated that the jury could have concluded that defendant "used" one of the firearms "as a means of safeguarding and facilitating illegal transactions and as an integral means of protecting his possession of the cocaine." *Id.*

The occupants of premises at which drugs are produced, bought, sold or delivered may have a well-founded belief that they, the drugs, or the money used in such transactions need protection. Cases have shown that there are often considerable amounts of cash present at such places at any one time, since these are obviously not transactions conducted via credit card. A loaded firearm kept in plain view may facilitate the orderly transaction of narcotics business just as effectively as does a drawn gun during a bank robbery. Although the need for such protection is not as readily apparent when there is no evidence that the conspirators actually sold cocaine on the premises, there still may be a need for security at the places, such as Trelopoulos' apartment, where those engaged in such transactions are based or where the drugs are stored.

We hold that the presence in plain view of a loaded firearm, even in premises

that are not heavily fortified with elaborate security devices, is evidence that the conspirators may have felt some need for security from which a jury could infer that the weapon was an integral part of the conspiracy and was "used" therein. We thus agree with the Court of Appeals for the Second Circuit which held recently that possession of a firearm constitutes use under section 924(c) if there is:

i) Proof of a transaction in which the circumstances surrounding the presence of a firearm suggest that the possessor of the firearm intended to have it available for possible use during the transaction; or ii) The circumstances surrounding the presence of a firearm in a place where drug transactions take place suggest that it was strategically located so as to be quickly and easily available for use during such a transaction.

*United States v. Feliz–Cordero*, 859 F.2d 250, 254 (2d Cir.1988).

In this case, the presence of a loaded shotgun in plain sight in Trelopoulos' apartment where it was readily accessible to the occupants was evidence that the firearm was in use during and in relation to the drug trafficking conspiracy proven in this case. The jury could reasonably have concluded that Trelopoulos used at least the shotgun found in the apartment "as a means of ... protecting his possession of the cocaine." *Robinson*, 857 F.2d at 1010.

However, the government did not rely solely on the loaded and accessible shotgun inside the apartment. Instead, the indictment charged and the court instructed that a conviction under section 924(c) could be based on any of the four guns found in the apartment or on the porch. The trial judge also properly instructed the jury that they must unanimously agree on which weapon Trelopoulos had used in order to convict him on count 35. Since the jury's general verdict does not reveal which of the guns the jury had concluded he had used during the conspiracy, we can uphold the verdict only if all of those firearms can be deemed to have been used in the cocaine trafficking conspiracy. *See United States v. Boffa*, 688 F.2d 919, 933 (3d Cir.1982) *cert. denied*,

460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983); *United States v. Dansker*, 537 F.2d 40, 51 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). The difficulty is that three of the four guns on which the government relies were found inside a trash can on the porch rather than in the apartment, and were not even discovered by the FBI until after Trelopoulos and Theodoropoulos were in FBI custody.

The government argues that as long as the firearms were available for use by Trelopoulos, they satisfy the requirements of section 924(c). We cannot agree. The legislative history of section 924(c) provides some illumination of its scope. The statute was amended in 1984 to substitute for the prior language making it a crime to carry a firearm "during the commission of any felony" the narrower language "during and *in relation to*" the crime. The Senate Report explains the new requirement as follows:

[T]he requirement that the firearm's use or possession be "in relation to" the crime would preclude its application in a situation where its presence played no part in the crime, *such as a gun carried in a pocket and never displayed* or referred to in the course of a pugilistic barroom fight.

S.Rep. No. 225, 98th Cong., 2nd Sess. 314 n. 10 (1983) *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3492 n. 10 (emphasis added).

In light of this amendment, the *Feliz–Cordero* court held that a loaded gun concealed in a drawer, which was discovered during a search of defendant's apartment was not used during or in relation to a drug trafficking offense. *Feliz–Cordero*, 859 F.2d at 254.

■ We cannot agree with the government that the mere availability of a firearm nearby, as distinguished from its open display, is equal to use "in relation" to an offense. We note that in drafting this provision, Congress required either use or carrying of a firearm. Had it intended the provision to encompass possession of a fire-

arm during a drug trafficking offense it would have so provided.

Because the weapons found in the trash can on the porch did not satisfy the requirement of section 924(c), and we cannot exclude the possibility that the jury convicted Trelopoulos solely on the basis of one or more of the weapons found on the porch, we will vacate his conviction on count 35. We are cognizant that Trelopoulos' sentence on count 35 runs concurrently with his sentence on count 36, which we uphold. We are not satisfied that there could be no collateral consequences from this additional conviction and thus will not apply the concurrent sentence doctrine. *See United States v. Clemons*, 843 F.2d 741, 743 n. 2 (3d Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 97, 102 L.Ed.2d 73 (1988). We will therefore remand this count to the district court for a new trial based only on the presence of the shotgun under instructions consistent with this opinion.

## III.

### *Ineffective Assistance of Counsel*

■ Although represented by court-appointed counsel on this appeal, Theodoropoulos has presented a host of additional claims *pro se*. These claims are based on

Theodoropoulos' allegations that his trial counsel, who is also his appellate counsel, was ineffective. Barrera and Peetros, who are represented by new counsel on appeal, have also raised ineffectiveness claims. Unless the record sufficiently establishes a basis for our review, the proper avenue for pursuing such claims is through a collateral proceeding in which the factual basis for the claim may be developed. *See United States v. Gambino*, 788 F.2d 938, 950 (3d Cir.), *cert. denied*, 479 U.S. 825, 107 S.Ct. 98, 93 L.Ed.2d 49 (1986); *Government of Virgin Islands v. Zepp*, 748 F.2d 125, 133–34 (3d Cir.1984).[4] Our affirmance of the convictions of these three defendants is without prejudice to their ability to initiate a section 2255 collateral proceeding for the resolution of their ineffective assistance of counsel claims.

## IV.

### *Conclusion*

In addition to the claims already discussed, appellants have also presented a plethora of other challenges to various rulings by the trial judge. We have considered all of these claims and conclude that none are meritorious.[5] We will there-

---

4. In this case, in light of the allegations leveled by Theodoropoulos, his counsel filed a motion to withdraw. We denied that motion and counsel filed a substantial brief. Theodoropoulos then moved to strike various arguments made by his counsel. Such arguments could not have prejudiced Theodoropoulos and his motion is denied. Theodoropoulos was given the right to file his own *pro se* brief on appeal and filed a lengthy brief which has been fully considered.

5. Those contentions, additional to those discussed in the text, are as follows: Theodoropoulos contends that the district court erred by denying his motion for withdrawal of counsel; by denying his motion for a mistrial as a result of the cross-examination of a government witness by counsel for a co-defendant; by denying his motion for severance as a result of the cross-examination of government's witness by counsel for a co-defendant; by denying his motion for a mistrial when a government witness referred to appellant's prior incarceration; by denying his motion for a mistrial as a result of the government's violation of a prior court order; by denying his motion in limine to prohibit a witness of the government from testifying to conversations prior to the inception date of the

conspiracy; by preventing him from recalling a witness of the government in his case-in-chief; by denying his motion for a continuance in order to produce additional witnesses; by refusing to give a requested point for charge; by allowing, over objection, a government witness to testify as to statements made by a co-defendant relating to the appellant; by allowing the jury to review a transcript of trial testimony during deliberation; by allowing the use of wire interceptions by an agent of the government without the proper authorization; and by allowing the government's use of perjured testimony. Barrera contends that the district court erred when it denied his motion for a severance under Fed.R.Crim.P. 14. Tsokas contends that the lower court erred in failing to grant a severance of defendants and/or counts with respect to firearms and firearms violations unrelated to the conspiracy which resulted in substantial prejudice to him, and by failing to grant severance and/or mistrial based on the cross-examination by counsel for defendant Makris of the government's expert. Trelopoulos contends that the district court erred in denying the suppression of evidence seized on April 3, 1987 at 526 North 22nd Street, and by failing to grant a

fore affirm the convictions of all appellants on all counts except that we will vacate the conviction of Trelopoulos on count 35 and remand that count for a new trial.

severance based on the admission of recorded conversations unrelated to the charged conspiracy which resulted in substantial prejudice to him. Peetros contends that the trial court committed reversible error in denying defendants' motion for a pretrial evidentiary hearing and admitting co-conspirator testimony against him.