924 F.2d 1059
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
James JACKSON, Defendant-Appellant.
 No. 90-1609.
 United States Court of Appeals, Sixth Circuit.
 Feb. 1, 1991.
 
 Before DAVID A. NELSON and RYAN, Circuit Judges, and GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge.
 RYAN, Circuit Judge.
 
 
 1
 Defendant-appellant James Jackson appeals from his conviction of possession of cocaine and heroin with intent to distribute, 21 U.S.C. Sec. 841, and possession or use of a firearm during a drug trafficking crime, 18 U.S.C. Sec. 924(c). He also appeals his sentence of 211 months imprisonment. The following issues are before us on appeal:
 
 
 2
 1. Whether the district court properly found that sufficient probable cause justified the search of Jackson's residence and that the affidavit did not contain false information;
 
 
 3
 2. Whether the district court erred in its instruction to the jury on the charge of possession of a firearm in connection with a narcotics crime;
 
 
 4
 3. Whether the district court erred in sentencing Jackson on the basis of possession with intent to distribute in excess of 50 grams of cocaine base;
 
 
 5
 4. Whether the district court erred in adding two points under the sentencing guidelines for obstruction of justice; and
 
 
 6
 5. Whether the prosecutor's comments during closing arguments resulted in manifest injustice and thus warrant reversal.
 
 
 7
 We conclude that the district court properly decided all of the issues and thus affirm.
 
 I.
 
 8
 On June 21, 1989, agents of the Drug Enforcement Agency and officers of the Detroit Police Department conducted a search warrant raid at Jackson's home in Detroit. When the police entered, Jackson tried to throw several plastic bags toward an open toilet but missed his target. The officers arrested Jackson and seized the plastic bags and their contents as evidence. The police then searched the rest of the house where they found a number of plastic bags containing an off-white substance, packaging materials, razor blades, and rubber bands in the basement and small coin envelopes containing a white substance in the hall closet. The agents also discovered ammunition and a number of weapons throughout the house: an inoperable handgun in the basement tool chest, two pistols in the upstairs bedroom, two unloaded pistols behind the bed, and a semi-automatic rifle and a twelve gage shotgun in the bedroom closet.
 
 
 9
 Jackson was charged with possession with intent to distribute cocaine and heroin in counts I and II of the indictment, and possession of a firearm in relation to a drug offense in count III.
 
 
 10
 Jackson filed a motion to suppress the drugs and arms found during the search and, on January 26, 1990, the court held an evidentiary hearing on this motion. The defense argued that the evidence should be suppressed because the search warrant affiant, Officer Gerard Biernacki, presented false information in the warrant and because the warrant did not establish probable cause to search. The court denied the motion, finding that although there was some discrepancy in the testimony, the affidavit's information was accurate.
 
 
 11
 At trial, expert testimony revealed that the powdery substance found at Jackson's house was 51.47 grams of 87% cocaine base, commonly known as crack, and that the substance found in the basement was .32 grams of crack cocaine. The small coin envelopes found in the hall closet contained 1.86 grams of heroin.
 
 
 12
 The jury convicted Jackson on all three counts. Because the total net weight of the cocaine exceeded 50 grams of cocaine base, the district court sentenced Jackson pursuant to the mandatory ten-year minimum of 18 U.S.C. Sec. 841(b)(iii). The court also adjusted the sentence two points upward under sentencing guideline Sec. 3C1.1 for obstruction of justice because Jackson had tried to destroy evidence. Jackson was sentenced to 211 months imprisonment.
 
 II.
 A. Warrant
 
 13
 Jackson asks the Sixth Circuit to reverse the district court's holding that the affidavit supporting the search warrant did not contain deliberately false information and that sufficient probable cause existed to issue the warrant. In reviewing this contention, the Sixth Circuit must uphold the district court unless its findings were clearly erroneous. United States v. Barone, 584 F.2d 118, 122 (6th Cir.1978), cert. denied, 439 U.S. 1115 (1979).
 
 
 14
 The warrant to search Jackson's home was based on the affidavit of Officer Gerard Biernacki and the statement of a confidential informant, Reginald Edwards, who Biernacki interviewed on June 10. Edwards gave the following written statement:
 
 
 15
 Q. What were you doing in the car w/the 3/B/M's at I-75 Serv. Dr. + Oakman?
 
 
 16
 A. They were taking me back to my Mom's house after they beat me up and cut me up because they said I stole $140.00 from their house on Lantz. x Reginald Edwards.
 
 
 17
 Q. What time and date did the beating and cutting start?
 
 
 18
 A. 4:30 a.m. today, 6-10-89, at my auntie's house on Hershey, they put a gun to my head, Andre had the gun and they told my aunt to to leave the house x Reginald Edwards.
 
 
 19
 Q. After they beat/cut you up what happened?
 
 
 20
 A. After "Dural" the guy w/the baseball hat on and the driver of the Blk T-Bird, took me over to a house by 7 Mile & Southfield, near a Kentucky Fried Chicken, and he picked up the other two guys The guy w/the baseball cap put 3 guns in the car He got the guns from the house on Lantz Street, he sells dope there too. And I know his other houses too x Reginald.
 
 
 21
 Q. You have been advised of your rights and make this statement freely?
 
 
 22
 A. Yes I have x Reginald Edwards.
 
 
 23
 At the suppression hearing, Biernacki testified that Edwards' statement was interrupted by the arrival of Emergency Medical Service (EMS) technicians to treat Edwards. After EMS left, Biernacki spoke further with Edwards but did not record the statement. Edwards' oral statement forms the basis for most of the affidavit's information. Biernacki made the following affidavit on June 20, 1989:
 
 
 24
 On June 8, 1989, Sgt. Arthur McNamara and his crew, from the Detroit Police Department Narcotics Section, executed a Search Warrant for the premises of 480 Lantz, which is located in City of Detroit Michigan. At this time a small amount of suspected crack cocaine was seized from the premises.
 
 
 25
 On June 10, 1989, your affiant met with a confidential informant (CI-1) [later identified as Edwards] who advised the affiant that 480 Lantz was a "Crack House" where some of the local people who sell narcotics in the area of Seven Mile and Woodward, Detroit Michigan, go and hide from the police. The CI-1 also advised the affiant that a grey K-car was being used to transport the narcotics from a [sic] unknown location on the west side of the city, which the CI-1 could point out as he had been taken there on June 10, 1989, where he observed a person known to him as Durell take a briefcase with narcotics proceeds, U.S. currency, into that location.
 
 
 26
 On June 13, 1989 the affiant with other members of the task force were in the area of 480 Lantz and at this time observed a grey K-car 1989 Michigan lic. # 291 XYR parked in front of 480 Lantz and the vehicle was occupied by a [sic] unknown Black/Female. Affiant and crew then followed the K-car 291 XYR to 19313 Mark Twain Detroit, Michigan, where the driver was observed to exit and enter 19133 [sic] Mark Tawin.
 
 
 27
 On June 13, 1989, affiant met with CI-1 at which time placed the CI-1 in a [sic] undercover vehicle and asked the CI-1 to show affiant where the west side location was located.
 
 
 28
 The CI-1 then directed the affiant directly to the 19313 Mark Twain address and after seeing the K-car 291 XYR parked in the drive stated to affiant that it was the car that the CI-1 had referred to on June 10, 1989.
 
 
 29
 On June 13, 1989 a search warrant for the premises of 19199 Hershey, Detroit Michigan was obtained from information provided by CI-1 and 2 persons were arrested as a result of this information. This search warrant was obtained by Lt. William Presley of the Detroit Police Department, Homicide Section.
 
 
 30
 On June 18, 1989, Police Officer Allan Smith of the Detroit Police Department, Homicide Section, with a crew, set up a surveillance of 19313 Mark Twain. On this date the crew observed a [sic] unknown black female enter the K-car 291 XYR, and proceed directly to 480 Lantz, where the black female entered for a short period of time and then exit and return directly to 19313 Mark Twain and entered from view.
 
 
 31
 On June 19, 1989 Sgt. Arthur McNamara and crew set up a surveillance of 19313 Mark Twain where he observed a [sic] unknown black female and two black males exit 19313 Mark Twain and enter the K-car 291 XYR, and again drive directly to 480 Lantz where the black female exited same and entered the Lantz address, for a short period of time and again exit and re-enter the K-car. They then drove to a address on East State Fair, where the black female then again exited the car and also entered that address from view. After a short period of time she exited the house and entered the K-car and drove directly back to 19313 Mark Twain where all persons then exited and re-entered the house from view.
 
 
 32
 Affiant's knowledge of the narcotics trade indicates that weapons and/or explosives or incendiary devices are commonly used in connection therewith: that monies or other assets derived from the trade are often found at the sites of narcotics related search warrants executions; and that records relating to narcotics transactions or hiding of proceeds from such transactions are commonly kept in the course of illegal drug trafficking, and likewise frequently found at the sites of search warrant executions.
 
 
 33
 At the suppression hearing, the defense challenged the affidavit because of the discrepancies between the written statement and the affidavit, particularly the information set forth in the second paragraph of Biernacki's affidavit. The testimony of Edwards failed to corroborate the exact times and dates involved; Edwards also did not recall giving an oral statement to Biernacki or giving him the address on Lantz. The defense also offered the testimony of Basim El-Amin who claimed that the car observed by police was Jackson's Chrysler LeBaron, but Jackson had loaned it to him on the days in question and that Basim had neither loaned the car to anyone nor driven it to the surveillance location himself. The testimony at the hearing failed to establish whose car it was and whether the license plates on the car at the time were those involved in the offense. The defense, then, failed to link the Chrysler LeBaron to the car observed by the surveillance team.
 
 
 34
 The court denied the motion to suppress. The court found that the discrepancies between Biernacki's and Edwards' memories could be attributable to the severe injuries which Edwards had sustained that night. The court also noted that Edwards did not deny telling Biernacki the information in the affidavit; he simply disputed the time.
 
 
 35
 Although there were discrepancies in the testimony, we cannot say the court clearly erred. The court had the opportunity to observe the witnesses' demeanor. Although the court does not specifically say that she based her decision on credibility determinations, she must have believed Officer Biernacki and her determination, based on actually hearing and viewing his testimony, should not be set aside lightly. 18 U.S.C. Sec. 3742(e).
 
 
 36
 The defense also argues that the court erred by applying the wrong standard. The court, in ruling from the bench, commented that the defense had not met its "heavy burden". The defense believes that the court, by referring to a "heavy burden", applied the clear and convincing evidence standard, not the preponderance of the evidence standard appropriate to these cases. See United States v. Bennett, 905 F.2d 931 (6th Cir.1990). The court, however, expressly stated that it was using the preponderance of the evidence standard. Moreover, in Bennett, the Sixth Circuit, in commenting on the defendant's burden in challenging the truthfulness of a search warrant affidavit, noted that the defendant in such a case "has a heavy burden". Id. at 934. In light of this recent statement by our circuit, it does not seem that the lower court erred in calling the burden a heavy one.
 
 
 37
 The defendant also challenges the court's decision because the affidavit did not provide the police with probable cause to search. A magistrate's probable cause finding must be based on the "totality of the circumstances" surrounding the affidavit. Illinois v. Gates, 462 U.S. 213 (1983). As the court explained in Gates:
 
 
 38
 The task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence will be found in a particular place. And the duty of the reviewing court is simply to insure that the magistrate had a "substantial basis for concluding" that probable cause existed.
 
 
 39
 Id. at 238-39. The magistrate's determination of probable cause "should be paid great deference by reviewing courts." Id. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)). Subjecting the magistrate's finding to "hypertechnical" examination would violate the strong public policy favoring searches pursuant to a warrant; invalidating the warrant on hypertechnical grounds would discourage officers from obtaining warrants before searching. Id.
 
 
 40
 Having found that the statements in the affidavit were not intentionally misleading nor untruthful, the district court could easily conclude that the magistrate had a "substantial basis for concluding" that probable cause existed. In order to establish probable cause, the affidavit must link the residence to be searched with the evidence sought. United States v. Freeman, 685 F.2d 942 (5th Cir.1982). In this case, the affidavit indicated that drug activities had occurred in the house and that a search should produce drugs, arms and the proceeds of drug sales. The totality of the circumstances indicate that the affidavit established probable cause. Unlike the anonymous tip in Gates, Biernacki spoke with his informant personally and learned that Edwards knew about the activities at Jackson's home from personal observation. Edwards' reliability was also proven by the prior arrests of two others based on his information about drug activities. The Court in Gates expressly noted that an informant's prior reliable information about a particular type of crime in the community diminished the need for a thorough basis of knowledge. Id. at 233. The police department's surveillance also lent credibility to Edwards' information by confirming the suspicious activities of the gray K-car which travelled repeatedly between a known "crack house" and the defendant's home. Such corroboration also decreases the need to rely on the informant's credibility in making a common sense probable cause determination. Id. at 244. Although the sweeping generalization at the end of the affidavit that weapons are usually found where drug trafficking occurs may not provide the necessary link between the house and the contraband, the officers' observations and Edwards' statement suffice to show that drug trafficking was occurring at Jackson's home and that a search would produce drugs and drug proceeds.
 
 
 41
 Finally, the defendant asserts that the good faith exception of United States v. Leon, 468 U.S. 897 (1984), should not be used to validate the search as the magistrate abandoned his detached and neutral role in making the probable cause finding and because no reasonable police officer could have believed that they had probable cause to search. Having found that probable cause existed, we need not reach this issue.
 
 B. Firearm Charge
 
 42
 Jackson was convicted under 18 U.S.C. Sec. 924(c)(1) which provides: "Whoever, during and in relation to any crime of violence or drug trafficking crime, ... uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years...." 18 U.S.C. Sec. 924(c)(1). The relevant count of the indictment charged that Jackson: "... during and in relation to a drug trafficking crime, that is, possession with intent to distribute controlled substances, used and possessed firearms; in violation of Section 924(d), Title 18, United States Code." In the jury instructions, the district court described the proof necessary for a conviction under this statute:
 
 
 43
 That the individual was involved in the distribution of a controlled substance.
 
 
 44
 That he knowingly used a firearm in order to protect the controlled substance.
 
 
 45
 For the offense charged in Count Three, the defendant is considered to have used a firearm if its presence in his possession in any manner facilitated the carrying out of the offense charged in count one or Count Two (sic), possession with intent to distribute controlled substances.
 
 
 46
 It is not necessary that the firearms be displayed or fired in order that it may be considered as having been used.
 
 
 47
 The defendant has used a firearm if it was an integral part of the criminal undertaking and its availability increased the likelihood that the criminal undertaking would succeed.
 
 
 48
 If a firearm is available to protect controlled substances, then it is used in a drug trafficking crime.
 
 
 49
 Jackson challenges his conviction on this count because the court erred by improperly amending the indictment by its instruction to the jury and by applying the "drug fortress theory" when the weapons were not readily accessible for use during the crime. The prosecution contends that the indictment and the jury instructions conform with this circuit's decisions adopting the "drug fortress theory."
 
 
 50
 The district court's jury instructions did not completely replicate the indictment: the indictment required that Jackson "use and possess" (emphasis added) the firearm but the jury instructions did not require both use and possession. Jackson argues that this change amounts to a constructive amendment to the indictment. The government argues that this difference is only a variance. A constructive amendment occurs when the variance "create[s] 'a substantial likelihood' that a defendant may have been 'convicted of an offense other than that charged by the grand jury.' " United States v. Hathaway, 798 F.2d 902, 911 (6th Cir.1986) (citation omitted). No such danger occurred here because the grand jury indictment specifically indicated that count three amounts to a violation of section 924(c) which requires only use or possession. The district judge's instructions also explained that use or possession suffice. What occurred here looks more like a variance: the charging terms were not changed but the evidence at trial proved facts which differed materially from those alleged in the indictment. Id. at 910. Because this change amounts to a variance, reversible error occurs only when the defendant shows that the change affected "substantial rights". Id. at 910-11. As Jackson made no such showing, the conviction should not fall on account of the difference between the indictment and the instructions.
 
 
 51
 Jackson also contends that he should not have been convicted under section 924(c) because although guns were in the house, the only gun he had access to during the offense was the inoperable gun in the basement; he alleges that the gun fortress theory should not apply where the firearms are not accessible during the crime. In making this argument, Jackson cites United States v. Feliz-Cordero, 859 F.2d 250 (2d Cir.1988) and United States v. Theodoropoulos, 866 F.2d 587 (3rd Cir.1989). In Feliz-Cordero and Theodoropoulos, the Second and Third Circuits held that the "in relation to" language of section 924(c) requires more than "mere availability": the circumstances must suggest that the defendant intend to and be able to use the firearm during the offense. This, however, has not been the law of the Sixth Circuit. Our circuit, in 1989, expressly adopted the fortress theory which provides that a defendant may be convicted under section 924(c) when he keeps weapons in the house but does not use or carry them at the time of the offense because "just as weapons are kept at the ready to protect military installations against potential enemy attack, so too may weapons be kept at the ready to protect a drug house, thereby safeguarding and facilitating illegal transactions." United States v. Acosta-Cazares, 878 F.2d 945, 951-52 (6th Cir.), cert. denied, 110 S.Ct. 255 (1989) (citation omitted); see also United States v. Henry, 878 F.2d 937 (6th Cir.1989). As our circuit recently endorsed the fortress theory, we should affirm the conviction under section 924(c).
 
 
 52
 C. Application of 21 U.S.C. Sec. 841(b)(1)(A)(iii)
 
 
 53
 In sentencing Jackson, the district court imposed a minimum sentence of ten years pursuant to 21 U.S.C. Sec. 841(b)(1)(A)(iii). This section provides that a person convicted of possession with intent to distribute under section 841(a) must be sentenced to a minimum of ten years where the violation involves "50 grams or more of a mixture or substance which described in clause (ii) contains cocaine base." 21 U.S.C. Sec. 841(b)(1)(A)(iii). Clause ii requires a detectable amount of various forms of cocoa leaves, cocaine, and their derivatives. Jackson argues that the district court erred in applying the penalty provision because the total net weight of cocaine seized was under 50 grams. The prosecution argues that the district court did not err because the statute does not require that the 50 grams of cocaine base represent 100% purity.
 
 
 54
 The mandatory penalty provision of section 841(b) "does not require the violation to involve 50 grams of cocaine base; rather it applies to '50 grams of a mixture or substance [of cocaine] which contains cocaine base.' " United States v. Barnes, 890 F.2d 545, 552 (1st Cir.1989), cert. denied, 110 S.Ct. 1326 (1990). Although, as Jackson points out, the evidence involved in Barnes, 72.5 grams of 97% pure cocaine base, would meet the requirement of 50 grams of pure cocaine base, the court expressly held that it need not meet this requirement for it to impose the penalty provision. This circuit came to a similar conclusion in a case dealing with LSD. In United States v. Elrod, the Sixth Circuit expressly rejected the purity argument advanced here by defendant Jackson. United States v. Elrod, 898 F.2d 60 (6th Cir.), cert. denied, 111 S.Ct. 104 (1990). In Elrod, the court found that the 10 gram requirement for LSD was met where the defendant possessed .09 grams of pure LSD and 10 grams of blotter paper. The court explained that the statute's wording "mixture or substance containing a detectable amount" of LSD, see 2 ?? S.C. Sec. 841(b)(1)(A)(v), indicates that the full 10 grams ?? not be composed of pure LSD. This conclusion was bolstered by contrasting the LSD section with the PCP provision which expressly created a net weight requirement of pure PCP. As Congress clearly knew how to write such a provision, the Sixth Circuit concluded that they did not intend to mandate such a net weight requirement for LSD. Elrod, 898 F.2d at 62. Because the same language is involved in the cocaine base section as the LSD section, we hold that the penalty provision of section 3841(b)(1)(A)(iii) applies regardless of whether the 50 grams involved constitute pure cocaine base.
 
 D. Obstruction of Justice
 
 55
 The district court increased Jackson's offense level by two points because he obstructed justice when he attempted to throw bags of cocaine into the toilet as the police entered his home. Jackson disagrees with this enhancement because the allegedly obstructive conduct occurred contemporaneously with the arrest. The prosecution argues that under the Guidelines in effect at the time of sentencing, the contemporaneous occurrence of the arrest and obstruction is irrelevant.
 
 
 56
 The Sentencing Guidelines provide a two point offense level enhancement for defendants who "willfully impeded or obstructed, or attempted to impede or obstruct the administration of justice during the investigation or prosecution of the instant offense." U.S.S.G. Sec. 3C1.1. An example of such conduct listed in the Application Notes is "destroying or concealing material evidence, or attempting to do so." Application Notes 1(a), U.S.S.G. Sec. 3C1.1.
 
 
 57
 Jackson argues that the Amendments which became effective November 1990 support his contention. Amendment 41(3)(d) provides that "if such (obstructive) conduct occurs contemporaneously with arrest ... it shall not, standing alone, be sufficient to warrant an adjustment for obstruction unless it results in a material hindrance to the official investigation or prosecution of the instant offense or the sentencing of the offender." The Sentencing Guidelines in effect when Jackson was sentenced, however, do not include the amendment Jackson quotes. Because no material hindrance occurred when the agents had to walk a few extra feet to retrieve the bags, Jackson argues that the obstructive conduct occurring at the time of arrest does not warrant the increased sentence.
 
 
 58
 Under the then current provision, obstruction of justice includes conduct during the investigation which ought to include the events leading up to the arrest. The Fifth Circuit agreed with this approach in a factually similar case. In United States v. Galvan-Garcia, the court used section 3C1.1 to increase the offense level of a defendant who threw bags of marijuana out the window during a high speed chase which culminated in their arrest. United States v. Galvan-Garcia, 872 F.2d 638 (5th Cir.), cert. denied, 110 S.Ct. 164 (1989). Because this rule, and not the exclusion of contemporaneous conduct, was the law at the time of sentencing, the district court did not clearly err.
 
 
 59
 Prosecutor's Comments During Closing Arguments
 
 
 60
 Jackson complains that certain comments made by the prosecutor during his rebuttal argument deprived Jackson of due process because of their fundamental unfairness. During the closing arguments of Jackson's attorney, Mr. Blank, mentioned that the jury should consider the lesser included offense of simple possession; Mr. Blank also counselled the jury to find Jackson not guilty of all counts. In his rebuttal argument, the prosecutor, Mr. Soisson, in discussing the unlikelihood of Jackson possessing such a large quantity of cocaine, 200 bags, for personal use, stated that "Mr. Blank's (sic) says well maybe just guilty of simple possession of it--." Transcript at 367. Mr. Blank immediately objected that he "did not say that. I said that they have other things to consider. I don't think the prosecution should be saying that I said my client's guilty of--." Id. Mr. Soisson then adopted Mr. Blank's phrase "other things to consider" and continued with his argument. Mr. Soisson took no further action until bringing this argument up on appeal.
 
 
 61
 Although improper prosecution statements during closing arguments may constitute reversible error, courts rarely reverse for admittedly improper comments. Angel v. Overberg, 682 F.2d 605, 608 (6th Cir.1982). In fact, the defense fails to cite one case when the court actually reversed. Such relief is only appropriate when the misconduct denies the defendant a fair trial by permeating the entire atmosphere of the trial. United States v. Vance, 871 F.2d 572, 577 (6th Cir.), cert. denied, 110 S.Ct. 323 (1989). Arguments of prejudice caused by closing arguments must be viewed in the totality of the trial. Donnelly v. De Christoforo, 416 U.S. 637, 645 (1974).
 
 
 62
 In this case, the prosecutor's remarks could have been interpreted, as the defense contends, as an admission by the defense counsel that Jackson was guilty of simple possession. On the other hand, the jury could have inferred what the prosecution probably intended: that the defense wanted the jury to consider the simple possession charge. When "two plausible interpretations can be given to a prosecutor's ambiguous final argument, the court should not strive to adopt the one which casts doubt upon the prosecutor's intentions." Angel, 682 F.2d at 608. An appellate court also should not reverse when efforts were made by the district court to mitigate the harm of the statements. Id.; Donnelly, 416 U.S. at 645. In this case, the closing arguments were prefaced by a reminder from the court that they were not evidence and the prosecutor himself opened his argument with the same reminder. The jury also heard an immediate objection by the defense counsel and a retraction by the prosecutor of the disputed comment. Thus, the jury, after hearing three days worth of arguments and evidence, would be unlikely to focus on the single ambiguous remark which the prosecutor immediately retracted and the court announced was not evidence. See Donnelly, 416 U.S. 637. Although the defense correctly argues that the prosecutor has a special role in criminal trials to ensure that justice is done, we do not believe that the disputed comment, viewed in the totality of the trial, sufficiently prejudiced the defendant to warrant reversal.
 
 III.
 
 63
 For the foregoing reasons, we AFFIRM Jackson's conviction and sentence.