UNITED STATES of America

v.

**Daniel TOUBY, Appellant.**

UNITED STATES of America

v.

**Lyrissa TOUBY, Appellant.**

Nos. 89–5604, 89–5605.

United States Court of Appeals,
Third Circuit.

Argued Jan. 23, 1990.

Decided July 27, 1990.

Rehearing and Rehearing In Banc
Denied Aug. 21, 1990.

---

Michael E. Deutsch (argued), Deutsch, Haas, Schmiedel & Taylor, Chicago, Ill., for appellant, Lyrissa Touby.

Daniel L. Meyers (argued), New York City, for appellant, Daniel Touby.

Samuel A. Alito, Jr., U.S. Atty., Glenn Moramarco (argued), Asst. U.S. Atty., Newark, N.J., for appellee.

Before SLOVITER, HUTCHINSON and COWEN, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

Defendants, who were convicted of conspiracy to manufacture and the manufacturing of a substance which was temporarily designated as a Schedule I controlled substance, contend that the statutory delegation to the United States Attorney General of the power to temporarily schedule drugs is unconstitutional and that his subdelegation of that power by regulation to the Drug Enforcement Agency (DEA) is unauthorized.

## I.

### Background

Defendants Daniel and Lyrissa Touby, husband and wife, were arrested January 6, 1989 at their home in Fair Lawn, New Jersey, and charged with conspiring to manufacture and knowingly and intentionally manufacturing 4–methylaminorex, a Schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1) (1988) and 21 U.S.C. § 846 (1988). 4–methylaminorex, a stimulant referred to as Euphoria, was placed on Schedule I by the DEA Administrator on October 15, 1987 pursuant to the temporary scheduling provisions of 21 U.S.C. § 811(h) (1988). The Toubys filed a pretrial motion to dismiss the indictment challenging the temporary scheduling of Euphoria, which the district court denied.

Daniel and Lyrissa Touby were convicted following a jury trial and sentenced to forty-two and twenty-seven months' imprisonment, respectively. Defendants filed a timely appeal and now renew their attack on the temporary scheduling process and on the sufficiency of the evidence as to Lyrissa Touby, an issue raised by her in a motion for a judgment of acquittal pursuant to Fed.R.Crim.P. 29, and rejected by the district court. In addition, Daniel Tou-

by has raised certain other contentions in his pro se brief.

We turn first to the issue of the constitutionality of the delegation and subdelegation of the temporary scheduling power.

## II.

### The Delegation Issues

### A.

### Statutory Background

In setting forth the background and legislative history of both the permanent and temporary scheduling provisions, we borrow liberally from the opinion of Judge Ackerman of the district court. *See* 710 F.Supp. 551, 552–55 (D.N.J.1989).

In 1970, Congress passed the Comprehensive Drug Abuse Prevention and Control Act, Pub.L. No. 91–513, 84 Stat. 1236 (1970); Title II of that Act is known as the Controlled Substances Act (CSA) (current version at 21 U.S.C. §§ 801–904 (1988)). The statute provides for placement of certain controlled substances on five different schedules. Scheduling a drug effectively criminalizes its use, manufacture and distribution, and determines the nature of the offense and the length of the sentence that may be imposed. The schedules range from Schedule I, listing substances that have a high potential for abuse, no accepted medical use in treatment in the United States, and a lack of accepted safety for use of the substance under medical supervision, to Schedule V, listing substances with a relatively low potential for abuse, a currently accepted medical use in treatment in the United States, and abuse of which may lead to limited dependence relative to the drugs on Schedules I through IV. *See* 21 U.S.C. § 812(b)(1), (5). The penalties vary accordingly.

The statute lists certain substances on each of the five schedules, but also provides that the Attorney General can add substances to the schedules, remove some,

and transfer between the schedules. *See* 21 U.S.C. § 811(a). The statute circumscribes the Attorney General's power to add substances in several respects. First, it lists the factors that must be considered for each substance proposed to be controlled, *i.e.*, (1) its actual or relative potential for abuse; (2) scientific evidence of its pharmacological effect, if known; (3) the state of current scientific knowledge regarding the drug or other substance; (4) its history and current pattern of abuse; (5) the scope, duration, and significance of abuse; (6) what, if any, risk there is to the public health; (7) its psychic or physiological dependence liability; and (8) whether the substance is an immediate precursor of a substance already controlled under this subchapter. *Id.* § 811(c). Second, the statute requires that the Attorney General obtain a "scientific and medical" evaluation of the substance from the Secretary of Health and Human Services, which is binding if the Secretary recommends that the Attorney General should not schedule the substance. *Id.* § 811(b). Finally, before adding a substance to the schedules, the Attorney General must follow the notice and hearing provisions of the Administrative Procedure Act (APA), codified at 5 U.S.C. §§ 551–559. 21 U.S.C. § 811(a).

In 1973, pursuant to 21 U.S.C. § 871(a), the Attorney General promulgated a regulation subdelegating performance of the functions delegated to him by Congress under the CSA to the DEA Administrator. *See* 28 C.F.R. § 0.100(b) (1986).[1]

Because the process of permanent scheduling contained an inevitable lag time, Congress amended the CSA in 1984 to permit the Attorney General to schedule substances on a temporary basis to "avoid an imminent hazard to the public safety" after consideration of those factors set out in 21 U.S.C. § 811(c)(4), (5) and (6), which relate to the history, current pattern, scope, duration and significance of abuse of the substance, and the risk it poses to the public

---

1. Section 871(a) provides:
 The Attorney General may delegate any of his functions under this subchapter to any officer or employee of the Department of Justice.

21 U.S.C. § 871(a).

health. 21 U.S.C. § 811(h)(1), (3). There is to be notice of the Attorney General's intention to temporarily schedule a substance published in the Federal Register and transmitted to the Secretary of HHS, whose comments must be taken into consideration. *Id.* § 811(h)(4). The duration of temporary scheduling of a substance is limited to one year with a possible extension up to six months. *Id.* § 811(h)(2).

The Attorney General amended the subdelegation regulation on July 1, 1987, assigning to the DEA Administrator the "[f]unctions vested in the Attorney General by the Comprehensive Drug Abuse Prevention and Control Act of 1970, as amended." 28 C.F.R. § 0.100(b) (1989). Thereafter, the DEA Administrator gave notice of his intention to temporarily schedule 4–methylaminorex as a Schedule I substance. 52 Fed.Reg. 30,174 (1987). The Administrator stated that the drug was a new and potent central nervous system stimulant that is clandestinely produced which can cause seizures, loss of consciousness, respiratory depression and death. *Id.* He concluded that the substance posed "an imminent hazard to public safety" and met the three criteria for temporary scheduling. *Id.* at 30,174-75. Three months later, the DEA Administrator issued an order temporarily scheduling 4–methylaminorex on Schedule I for a year. *See* 52 Fed.Reg. at 38,225-26 (1987). Concurrently, the DEA Administrator issued a notice of proposed rulemaking to place the substance permanently on Schedule I at the end of the one-year temporary period. 53 Fed.Reg. 40,390 (1988). The following year, the DEA Administrator extended the temporary scheduling for six months. *See* 53 Fed.Reg. 40,061 (1988).

### B.

### *Jurisdiction*

■ As an initial matter, we consider the effect on our jurisdiction of the provision of the statute that an order issued under section 811(h)(1) (the temporary scheduling section) "is not subject to judicial review." 21 U.S.C. § 811(h)(6). Although the government's position is that jurisdiction exists and defendants do not address the

issue, it is axiomatic that "this court has a 'special obligation' to satisfy itself of its own jurisdiction," *McNasby v. Crown Cork and Seal Co.,* 832 F.2d 47, 49 (3d Cir.1987) (citing *Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986)), *cert. denied,* 485 U.S. 936, 108 S.Ct. 1112, 99 L.Ed.2d 273 (1988), as well as the jurisdiction of the court under review. *Pomper v. Thompson,* 836 F.2d 131, 132 (3d Cir.1987).

■ When constitutional questions are at issue, "the availability of judicial review is presumed and [courts] will not read a statutory scheme to take the 'extraordinary' step of foreclosing jurisdiction unless Congress' intent to do so is manifested by 'clear and convincing' evidence." *Califano v. Sanders,* 430 U.S. 99, 109, 97 S.Ct. 980, 986, 51 L.Ed.2d 192 (1977). Nothing in the legislative history of the statute suggests that Congress meant to prevent those facing criminal charges to be foreclosed from attacking the constitutionality of the delegation of power to temporarily schedule drugs contained in section 811. Every court that has considered whether section 811(h)(6) precludes consideration of the constitutionality of the delegation of the power to temporarily schedule drugs under section 811 has explicitly or implicitly concluded that constitutional review is not precluded. *See United States v. Emerson,* 846 F.2d 541, 544 (9th Cir.1988); *United States v. Spain,* 825 F.2d 1426 (10th Cir.1987); *United States v. Hovey,* 674 F.Supp. 161 (D.Del.1987); *United States v. Pees,* 645 F.Supp. 697 (D.Colo.1986). We agree with these courts that, whatever the import of the limitation on judicial review, it does not extend to review of constitutional challenges.

### C.

### *Analysis*

Defendants raise what is in essence a facial challenge to the temporary scheduling provision. Although at oral argument their counsel stated that this was also an as-applied challenge, defendants do not contend that Euphoria cannot be scheduled as

a Schedule I narcotic or that the temporary scheduling of the substance did not meet the standards set forth in 21 U.S.C. § 811(h). Accordingly, we look only to the face of the statute and not at the particular properties of Euphoria or the justifications given by the DEA Administrator for its temporary scheduling.[2]

Defendants' delegation challenge raises three distinct questions: first, whether Congress' delegation to the Attorney General of the power to temporarily schedule was constitutional; second, whether the Attorney General was authorized by Congress to subdelegate this power to the Administrator of the DEA; and third, whether the Attorney General properly exercised his authority to subdelegate the power to the DEA.

### 1. Delegation to Attorney General

Article I, section 1 of the Constitution provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1. This section "is both a grant of power to the Congress and limitation upon its use." R. Pierce, S. Shapiro, P. Verkuil, Administrative Law & Process 51 (1985). Congress may not delegate its legislative power to others. Although commentators have noted the dormancy of the non-delegation doctrine, *see, e.g.,* 1 K. Davis, Administrative Law of the Eighties §§ 3.1-1 to 3.1-3 (Supp.1989); 1 J. Stein, G. Mitchell, B. Mezines, Administrative Law § 3.03[4] at 3-102 to 3-104 & n. 84 (1988) [hereinafter cited as J. Stein], the Supreme Court recently reaffirmed its vitality in *Mistretta v. United States,* 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989).

The Court reiterated the long-established principle that " 'the integrity and maintenance of the system of government ordained by the Constitution,' mandate that

Congress generally cannot delegate its legislative power to another Branch." *Id.,* 109 S.Ct. at 654 (quoting *Field v. Clark,* 143 U.S. 649, 692, 12 S.Ct. 495, 504, 36 L.Ed. 294 (1892)). However, the Court also emphasized that the Constitution does not prohibit Congress from obtaining assistance from coordinate branches. *Mistretta,* 109 S.Ct. at 654. Thus, Congress may delegate authority to a coordinate branch when it lays "down by legislative act an *intelligible principle* to which the person or body authorized to [exercise the delegated authority] is directed to conform." *Id.* (quoting *J.W. Hampton Jr., & Co. v. United States,* 276 U.S. 394, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928)) (emphasis added). The Court described its application of this general rule as having "been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." 109 S.Ct. at 654.

In *Mistretta* the Court considered, *inter alia,* the constitutionality of Congress' delegation to the Federal Sentencing Commission of the power to promulgate the Federal Sentencing Guidelines. The Court upheld the delegation because Congress specified the goals the Commission must aim for, the final product of the delegation, specific factors the Commission must consider, and limits on the Commission's power. *Id.* at 655–57. These four factors are relevant but not exclusive. Other factors the Court has identified when determining whether delegation is proper are the availability of judicial review, *see Carlson v. Landon,* 342 U.S. 524, 542–44, 72 S.Ct. 525, 535–36, 96 L.Ed. 547 (1952), the rapidity of changes in the matter being regulated, *see Yakus v. United States,* 321 U.S. 414, 432, 64 S.Ct. 660, 671, 88 L.Ed. 834 (1944), the complexity of the field, *see Mistretta,* 109

---

**2.** We do not foreclose the possibility that a defendant could raise, as a matter of due process, the defense that a substance was improperly scheduled because it does not fit within the standards that Congress established. Arguably, such a defense might be raised by a defendant who was convicted for manufacture, distribution or possession of a temporarily scheduled

drug that was later removed from the schedule because it did not meet the criteria for permanent scheduling of prohibited substances. *See United States v. Pees,* 645 F.Supp. 697 (D.Colo. 1986) (after Ecstacy–MDMA was temporarily placed on Schedule I, administrative law judge ruled it could not be permanently placed on Schedule I or II).

S.Ct. at 654, and the existence of "well-known and generally acceptable standards" in the field being regulated, *Fahey v. Mallonee*, 332 U.S. 245, 250, 67 S.Ct. 1552, 1554, 91 L.Ed. 2030 (1947).

In applying the "intelligible principle" test, the Court has given Congress wide latitude in delegating its powers. With the exception of the two 1935 cases invalidating statutes as unconstitutional delegations of power, *see Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935), and *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), the Court has upheld every congressional delegation of power that has been presented to it, even where Congress has provided negligible standards for the delegatee to follow. *Mistretta*, 109 S.Ct. at 655; 1 J. Stein at § 3.03[3] at 3-84 to 3-85.

Defendants argue that a more stringent non-delegation analysis applies when, as in this case, the delegatee is empowered to create crimes. They point out that both *Panama Refining* and *Schechter Poultry* involved a delegation of authority to criminalize activity.

The issue in *Panama Refining* involved the validity of Congress' delegation to the President in the National Industrial Recovery Act (NIRA) of authority to prohibit the interstate transport of petroleum produced or withdrawn from storage in violation of state law. The Court struck down the delegation because the statute did not declare any policy as to the transportation of the excess production, did not qualify the President's authority, and did not establish any criterion "to govern the President's course." 293 U.S. at 415, 55 S.Ct. at 246. In *Schechter Poultry*, the Court considered another provision of the NIRA authorizing the President to approve codes of fair competition emanating from industry groups or which were prescribed by the President himself. 295 U.S. at 521-22, 55 S.Ct. at 839-40. Violation of the codes was a crime. The Court found that Congress overstepped its power to delegate because it failed to establish the standards of legal obligation, leaving that decision to the

President or the trade or industry involved. *Id.* at 541-42, 55 S.Ct. at 848.

There is language in subsequent cases which focuses on the fact that both of these cases involved criminal conduct. In *Fahey v. Mallonee*, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947), the Court upheld the delegation of the terms by which conservators could be appointed for savings and loan associations, noting that the "discretion to make regulations to guide supervisory action in such matters may be constitutionally permissible while it might not be allowable to authorize creation of new crimes in uncharted fields." *Id.* at 250, 67 S.Ct. at 1554. The Court commented that both *Schechter Poultry* and *Panama Refining* involved the delegation of the power "to make federal crimes of acts which had never been such before and to devise novel rules of law in a field in which there had been no settled law or custom." *Id.* at 249, 67 S.Ct. at 1554. *See also Mistretta*, 109 S.Ct. at 655 n. 7 (commenting that unlike the statutes at issue in *Panama Refining* and *Schechter Poultry*, the Sentencing Guidelines do "not make crimes of acts never before criminalized").

However, despite the suggestion in this language that a higher standard of review should be applied when the delegation involves criminal penalties, the Court does not appear to have done so. *See, e.g., Yakus*, 321 U.S. at 426-27, 64 S.Ct. at 668-69 (upholding delegation to Price Administrator of power to fix maximum prices of commodities and rents even though violation of those prices was criminal). *But see United States v. Robel*, 389 U.S. 258, 274-75, 88 S.Ct. 419, 429-30, 19 L.Ed.2d 508 (1967) (Brennan, J., concurring) (area of permissible indefiniteness in delegation narrows where regulation invokes criminal sanctions). This court has previously rejected the argument that a stricter standard for delegation is required when the delegated authority might result in criminal sanctions. *See United States v. Frank*, 864 F.2d 992, 1017 (3d Cir.1988) (majority of Supreme Court has not "shown any inclination in *Robel* or since, to depart from the holding in *Yakus* ... which upheld the imposition of a criminal

sanction for the violation of an administrative price regulation under the usual delegation test"), *cert. denied,* — U.S. —, 109 S.Ct. 2442, 104 L.Ed.2d 998 (1989).

Finally, even if it were proper to apply a stricter standard in reviewing delegation of the power to create crimes in an "uncharted field," here the area is not "uncharted." The Attorney General has had the power to schedule drugs on a permanent basis since 1970, a power which has been consistently upheld. *See, e.g., United States v. Alexander,* 673 F.2d 287 (9th Cir.), *cert. denied,* 459 U.S. 876, 103 S.Ct. 168, 74 L.Ed.2d 139 (1982); *United States v. Barron,* 594 F.2d 1345 (10th Cir.), *cert. denied,* 441 U.S. 951, 99 S.Ct. 2180, 60 L.Ed.2d 1056 (1979); *United States v. Gordon,* 580 F.2d 827 (5th Cir.), *cert. denied,* 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978); *United States v. Roya,* 574 F.2d 386 (7th Cir.), *cert. denied,* 439 U.S. 857, 99 S.Ct. 172, 58 L.Ed.2d 165 (1978); *United States v. Pastor,* 557 F.2d 930 (2d Cir.1977).

Judge Hutchinson, in his thoughtful dissent, consistently refers to the power granted to the Attorney General under section 811(h) as the power to "define primary criminal conduct." *See, e.g.,* Dissenting Op. at 776. We believe that characterization is overstated. It is Congress which has defined "the primary criminal conduct" at issue, by making it unlawful, *inter alia,* to manufacture and possess with intent to distribute substances listed on the five schedules. *See* 21 U.S.C. § 841(a)(1). The Attorney General's power encompassed in section 811(h) to schedule a substance on a temporary basis when necessary "to avoid an imminent hazard to the public safety" is limited to scheduling a substance in Schedule I only. *See* 21 U.S.C. § 811(h).

Congress has established Schedule I, the most severe of the five schedules, as covering the following:

(1) Schedule I.—

(A) The drug or other substance has a high potential for abuse.

(B) The drug or other substance has no currently accepted medical use in treatment in the United States.

(C) There is a lack of accepted safety for use of the drug or other substance under medical supervision.

21 U.S.C. § 812(b). Thus, the Attorney General, in placing drugs or substances on Schedule I, is not defining primary criminal conduct but merely designating the drugs or substances which fall within Congress' general description. This is independent of the factors which section 811(h) requires the Attorney General to consider in exercising the delegated temporary scheduling power.

■ Accordingly, we will apply the general standard enunciated by the Supreme Court and consider whether Congress has provided an intelligible principle to govern the Attorney General's temporary scheduling of a substance pursuant to section 811(h). The two courts that have decided the question agree that section 811(h) is a constitutional delegation to the Attorney General. *See Emerson,* 846 F.2d 541; *United States v. Lichtman,* 636 F.Supp. 438 (S.D.Fla.1986).

In *Mistretta,* the Court looked to the goal Congress charged the delegatee to carry out. In this statute, that goal is explicit: to "avoid an imminent hazard to the public safety." 21 U.S.C. § 811(h)(1). The legislative history makes clear that Congress determined that the regular procedures for scheduling drugs were inadequate because clever chemists were able to create "designer drugs" similar to scheduled substances but which contained a slight variation which made the designations on the schedules inapplicable to them. These designer drugs were being developed and widely marketed long before the government was able to schedule them. "During the interim ... enforcement actions against traffickers are severely limited and a serious health problem may arise." S.Rep. No. 225, 98th Cong., 2d Sess. 264, *reprinted in* 1984 U.S.Code & Admin.News 3182, 3446. Thus, for example, the DEA Administrator justified the temporary scheduling of Euphoria on the ground that its pharmacological profile closely resembles that of an amphetamine, a Schedule I substance, *see* 21 U.S.C.

§ 812(c), Schedule I(c) (1988), but is not governed by the permanent schedules. 52 Fed.Reg. 30,174 (1987).

■ The Toubys argue that the statutory delegation to the Attorney General is deficient because it contains inadequate standards. We do not agree. Although the section does not contain as much guidance as is provided for permanent scheduling, it does not leave the Attorney General without any guidance in determining whether a drug poses an imminent hazard to public safety. It requires the Attorney General to consider three specified factors: (1) the history and pattern of abuse, (2) the scope, duration and significance of abuse, and (3) the risk to public health. *See* 21 U.S.C. § 811(h). These provide at least as much guidance as the "public convenience, interest, and necessity" standard upheld as the basis for FCC regulations, *see National Broadcasting Co. v. United States*, 319 U.S. 190, 225–26, 63 S.Ct. 997, 1013–14, 87 L.Ed. 1344 (1943), or the "excessive profits" standard used in the wartime Renegotiation Act as the basis for administrative officials to renegotiate supply contracts, *see Lichter v. United States*, 334 U.S. 742, 783–87, 68 S.Ct. 1294, 1315–18, 92 L.Ed. 1694 (1948). Furthermore, the five additional factors which the Attorney General must consider when effecting a permanent scheduling at least provide a useful guide for the exercise of the temporary scheduling function. *See Fahey*, 332 U.S. at 250, 67 S.Ct. at 1554 (existence of related statutes and well-defined practices in field relevant to constitutionality of delegation).

Finally, the Attorney General's power to schedule substances is not unlimited.[3] The maximum duration for the temporary scheduling of a substance is 18 months. In fact, the temporary scheduling power can be viewed as preliminary to and in aid of the permanent scheduling authority as set forth in section 811(a).

Not surprisingly, because the provision for temporary scheduling is designed to allow for faster scheduling, it has fewer

criteria and procedural requirements. It would defeat the congressional goal of fast responsive action to the emergence of designer drugs if temporary scheduling were to require the same degree of detailed preliminary procedure that must precede permanent scheduling.

Congress has described the temporary scheduling provisions as an "emergency control." S.Rep. No. 225, 98th Cong., 2d Sess. at 265, *reprinted in* 1984 U.S.Code & Admin.News at 3447. Section 811(h) was Congress' response to the rapid development and distribution of illicit drugs in ways that cannot always be foreseen and with results that are often devastating to individuals and to our society. Under these circumstances, it was reasonable for Congress to broadly delegate special authority to the Attorney General, particularly when the delegation permits scheduling to be effective only for a limited period of time. *See Emerson*, 846 F.2d at 545; *Lichter*, 334 U.S. at 785, 68 S.Ct. at 1316 (Congress need not supply specific formula in a field where adaptation and flexibility are essential).

The Toubys contend that even if Congress has provided adequate guidance to the Attorney General, the lack of the procedural protections of the Administrative Procedure Act, which include notice, public hearings, and a comment period, *see* 5 U.S.C. § 553 (1988), compounded by the statutory limit on judicial review, is fatal to the constitutionality of the delegation. It is true that the full panoply of APA procedures is not required for temporary scheduling, but the Attorney General must file a notice in the Federal Register of intent to schedule the substance and wait thirty days before the temporary scheduling takes effect. This is not an insignificant protection. It gives an opportunity to persons in the scientific community, chemical or pharmaceutical manufacturers, or other members of the public who believe that a substance about to be temporarily scheduled has significant beneficial public pur-

---

**3.** The Toubys' suggestion that the Attorney General, in his unlimited discretion, could schedule alcohol or tobacco is farfetched. These substances are exempted from the Act. 21 U.S.C. § 802(6).

pose and should not be scheduled, even temporarily, to bring their views to the attention of the Attorney General or his designee within that 30–day period. Assuming that some delegations would not be sustained because of the failure to provide APA-type procedures, we do not think this invalidates the delegation of the temporary scheduling power, in view of the limited duration of the scheduling and the emergency situation it is designed to remedy. *See Emerson,* 846 F.2d at 545.

 Nor do we believe that the preclusion of judicial review found in section 811(h)(6) is enough of a basis to find that the delegation is unconstitutional. Judicial review is the usual vehicle by which executive action is tested to insure that "the will of Congress has been obeyed." *Skinner v. Mid–America Pipeline Co.,* 490 U.S. 212, 109 S.Ct. 1726, 1731, 104 L.Ed.2d 250 (1989) (quoting *Mistretta,* 109 S.Ct. at 658). *See Amalgamated Meat Cutters & Butcher Workmen v. Connally,* 337 F.Supp. 737, 759 (D.D.C.1971) (3–judge panel) ("the safeguarding of meaningful judicial review is one of the primary functions of the [nondelegation] doctrine"); *see also* L. Jaffe, Judicial Control of Administrative Action 261–394 (1965) (arguing availability of judicial review is necessary to validity of administrative action). The availability of judicial review at some appropriate time insures that the discretion of the executive officer to whom power has been delegated cannot be exercised in an unbridled manner. *See Carlson,* 342 U.S. at 542–43, 72 S.Ct. at 535–36.

On the other hand, the preclusion of review of many administrative actions has been upheld by the Supreme Court. *See, e.g., Block v. Community Nutrition Inst.,* 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984) (consumers may not obtain judicial review of milk market orders issued by Secretary of Agriculture); *Briscoe v. Bell,* 432 U.S. 404, 97 S.Ct. 2428, 53 L.Ed.2d 439 (1977) (Voting Rights Act bars judicial review of Attorney General's determination that preconditions for application of the Act to particular jurisdictions have been met); *Johnson v. Robison,* 415 U.S. 361, 367, 94 S.Ct. 1160, 1165, 39 L.Ed.2d 389 (1974) (Congress may preclude review of all nonconstitutional attacks on Veteran's Administration's provision of benefits); *see also* 5 U.S.C. § 701(a)(1) (1988) (judicial review under APA unavailable where relevant statute precludes it).

Congress' preclusion of judicial review of the temporary scheduling order is consistent with its intent, reflected in the legislative history, that there be prompt effectuation of such orders. As we have already suggested, *see supra* note 2, this does not necessarily preclude review of the application of the temporary scheduling power in an individual case. Thus, for example, in *Estep v. United States,* 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946), the Court held that a draftee who faced criminal prosecution for refusal to submit to induction was permitted to raise the defense that the draft board's actions were lawless and outside its jurisdiction, despite a statutory provision limiting judicial review of the decisions of the local boards. The Court stated, "[w]e cannot readily infer that Congress departed so far from the traditional concepts of a fair trial when it made the actions of the local [draft] boards 'final' as to provide that a citizen of this country should go to jail for not obeying an unlawful order of an administrative agency." *Id.* at 122, 66 S.Ct. at 427.

Indeed, we note that the court in *United States v. Caudle,* 828 F.2d 1111 (5th Cir. 1987), without discussing the provision in section 811(h)(6) limiting judicial review, upheld the dismissal of an indictment charging distribution of a temporarily scheduled drug because the Attorney General had not issued the order temporarily scheduling the drug in accordance with the time limits provided in section 811(h). *See Pees,* 645 F.Supp. at 704 (suggesting limitation on review is unconstitutional).

We hold that the absence of the full array of APA procedures and judicial review at the time of the scheduling order does not invalidate the delegation of the power to temporarily schedule substances given by Congress to the Attorney General. The intelligible principle pursuant to which

the Attorney General is to exercise that power is evident from the statute. The standards which the Attorney General is to use and the provision for public notification are sufficient to meet constitutional requirements. Accordingly, we reject the Toubys' challenge to the statutory delegation to the Attorney General provided in section 811(h).

## 2. Subdelegation by the Attorney General to the Administrator of the DEA

The Toubys next challenge the temporary scheduling of Euphoria by the DEA on the ground that the Attorney General has not been authorized by statute to subdelegate his authority to temporarily schedule drugs under section 811(h).

■ The 1984 amendments to the Controlled Substances Act which provided for temporary scheduling do not include any specific authorization for the Attorney General to subdelegate his responsibilities under the amendments. Dangerous Drug Diversion Control Act of 1984, Pub.L. No. 98–473, 98 Stat. 2068, 2070–71 (1984). The Attorney General relies on two other statutes for this power. One, enacted in 1966 pursuant to a reorganization of the Justice Department, provides that the Attorney General "may from time to time make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General." 28 U.S.C. § 510 (1982). The second, part of the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. No. 91–513, 84 Stat. 1236 (codified at 21 U.S.C. § 871(a)), provides that the "Attorney General may delegate any of his functions under this title to any officer or employee of the Department of Justice." *Id.* at 84 Stat. 1270.

In arguing that the 1966 and 1970 general authorizations of the power to subdelegate are insufficient and that express authorization is required, the Toubys rely on *United States v. Spain*, 825 F.2d 1426 (10th Cir.1987), where the court, after referring to the "borderline standards in the delegation by Congress to the Attorney

General," *id.* at 1429, found that the subdelegation to the DEA was impermissible. However, the issue decided in *Spain* was whether it could be inferred that the Attorney General actually subdelegated his power to the DEA, not whether he had the authority to do so under these statutory provisions. *Id.*

The central inquiry with respect to a subdelegation challenge is whether Congress intended to limit the delegatee's power to subdelegate. *See Fleming v. Mohawk Wrecking & Lumber Co.*, 331 U.S. 111, 120–22, 67 S.Ct. 1129, 1134–35, 91 L.Ed. 1375 (1947); *United States v. Giordano*, 416 U.S. 505, 512–23, 94 S.Ct. 1820, 1825–30, 40 L.Ed.2d 341 (1974). In *Fleming,* the Court held that the Administrator of the Emergency Price Control Act was authorized to delegate to district directors his power to sign and issue subpoenas pursuant to a general provision of the Act which stated that the Administrator may appoint employees to carry out his functions and duties under the Act and that any duly authorized representative may exercise any or all of the Administrator's powers. 331 U.S. at 120, 67 S.Ct. at 1134. After examining the language of the Act and its legislative history, the Court found no congressional intent to limit this general authority to subdelegate. *Id.* at 120–22, 67 S.Ct. at 1134–35. In the absence of a statutory provision listing certain delegable powers, thereby implicitly excluding others, there was no reason to assume that the subpoena power should be excluded from the general delegation authority. *Id.*

In contrast, in *Giordano,* where the Court held that the Attorney General could not rely on the general delegation provision in 28 U.S.C. § 510 to subdelegate the authority to authorize an application to a federal judge for an order for a wiretap, 416 U.S. at 514, 94 S.Ct. at 1826, the Court noted that Congress had specified in the Omnibus Crime Control and Safe Streets Act of 1968 the positions of individuals who had that authority, *i.e.,* the Attorney General or any Assistant Attorney General specially designated by the Attorney General, 18 U.S.C. § 2516(1). *Giordano,* when read

in conjunction with *Fleming*, suggests that the Court will uphold subdelegations by the Attorney General pursuant to 28 U.S.C. § 510, unless there is specific evidence of congressional intent to the contrary. In this case, the Toubys have pointed to no such evidence.

Furthermore, in *Fleming* and *Giordano* the Supreme Court made clear that Congress need not expressly authorize subdelegation when a general subdelegation statute exists. *See Fleming*, 331 U.S. at 121, 67 S.Ct. at 1134; *Giordano*, 416 U.S. at 513–14, 94 S.Ct. at 1825–26. Finally, although the concurrence in *Fleming* mentioned the need for subdelegation of the burdensome and time-consuming function of signing subpoenaes, *Fleming*, 331 U.S. at 123–24, 67 S.Ct. at 1135–36 (Jackson, J., concurring), it did not suggest that such need is a *sine qua non* to finding authority to subdelegate, and no case so holds. Thus, even if the Toubys were correct in their contention that scheduling does not require expert scientific determinations, a contention we find problematic, that would not lead us to hold that the general authority granted in 28 U.S.C. § 510 is inapplicable here.[4] *See also Hovey*, 674 F.Supp. at 167 (Attorney General is authorized by 28 U.S.C. § 510 to subdelegate his authority to temporarily schedule drugs).

### 3. The Exercise of the Attorney General's Subdelegation Power

The Toubys' final delegation argument is that, in any event, the Attorney General failed to expressly subdelegate his section 811(h) authority. Unquestionably, he must do so explicitly in order for the subdelegatee to be empowered to act. *See Greene v. McElroy*, 360 U.S. 474, 506–07, 79 S.Ct. 1400, 1418–19, 3 L.Ed.2d 1377 (1959) (where individual liberties are at stake subdelegation must be express). Some background will be useful in our consideration of this issue.

In 1973, the Attorney General subdelegated to the DEA Administrator the performance of the functions delegated to

him by Congress under the CSA, including the permanent scheduling of drugs. *See* 28 C.F.R. § 0.100(b) (1986). However, he failed to expressly subdelegate to the DEA his new power to temporarily schedule after the passage of the 1984 amendments permitting temporary scheduling of drugs. In response to challenges raised by criminal defendants to the authority of the DEA to temporarily schedule drugs in the absence of such an express subdelegation, several courts held that the new statutory authority to temporarily schedule drugs was equivalent to new legislation rather than a mere amendment, that the 1973 subdelegation could not be read to cover a substantially different power created after the subdelegation was made, that there was no express subdelegation of the new power, and that as a result the DEA's actions were unauthorized. *See Emerson*, 846 F.2d at 548; *Spain*, 825 F.2d at 1429; *Hovey*, 674 F.Supp. at 169–71; *Pees*, 645 F.Supp. at 704.

Apparently in response, in July 1987 the Attorney General promulgated a new version of section 0.100(b) which states that the Attorney General subdelegates to the DEA Administrator "[f]unctions vested in the Attorney General by the Comprehensive Drug Abuse Prevention and Control Act of 1970, *as amended.* This will include functions which may be vested in the Attorney General in subsequent amendments to the [Act] and not otherwise specifically assigned or reserved by him." 28 C.F.R. § 0.100(b) (1988) (emphasis added). In the comments accompanying the new regulation in the Federal Register, the Department of Justice stated that "[w]hile the Attorney General asserts that any functions granted to him pursuant to [amendments to the Act] were properly delegated to the Administrator of DEA by the 1973 Order, this amendment will ensure that any functions vested in the Attorney General by any statutory amendments to the [Act] are delegated to the Administrator of the [DEA] unless otherwise specifically as-

---

4. Because we hold that 28 U.S.C. § 510 alone permits the subdelegation, we need not decide whether 21 U.S.C. § 871 provides an alternative basis for that action.

signed or reserved by the Attorney General." 52 Fed.Reg. 24,447 (1987).

This is apparently the first case to consider the adequacy of the 1987 regulation to effect a subdelegation.[5] Defendants argue that the new subdelegation is inadequate because it does not specifically refer to section 811(h) and the authority to temporarily schedule drugs. Although the Attorney General's subdelegation must be explicit, it need not mention by name every power it subdelegates. The regulation explicitly subdelegates every power given to the Attorney General by amendments to the Act. Section 811(h) was clearly an amendment to the Act. It was enacted before the 1987 subdelegation and thus was encompassed in the 1987 subdelegation.[6] Accordingly, we hold that the 1987 subdelegation contained in 28 C.F.R. § 0.100(b) was sufficiently precise and express to effectuate a subdelegation of the Attorney General's section 811(h) powers to the DEA Administrator.

To summarize, we hold that the delegation to the Attorney General of the power to temporarily schedule drugs did not violate the non-delegation doctrine. Furthermore, we have determined that the Attorney General was authorized by Congress to subdelegate his temporary scheduling powers to the Administrator of the DEA and that the Attorney General did, in fact, exercise his authority to subdelegate. Accordingly, we reject defendants' contention that their indictments for manufacture of a temporarily scheduled drug must be dismissed.

### III.

### Sufficiency of the Evidence

 Lyrissa Touby argues that there was insufficient evidence to support the jury's finding of her guilt. We must view the evidence in the light most favorable to the government as the verdict winner.

*United States v. McNeill*, 887 F.2d 448, 449–50 (3d Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1152, 107 L.Ed.2d 1055 (1990). The principal ingredients of 4-methylaminorex are norephedrine, sodium acetate and cyanogen bromide. Daniel Touby purchased cyanogen bromide from Eastman Kodak Company in September 1988. There was evidence that twice on October 3, 1988 Lyrissa Touby picked up from General Laboratory Supplies boxes, wrapped in plain paper, containing sodium acetate, sodium carbonate, potassium carbonate and norephedrine hydrochloride pursuant to orders called in by a man who identified himself as "Dan." She signed receipts itemizing the chemicals purchased and told a company employee that the chemicals were being used to adhere decals to T-shirts. No evidence was presented at trial that the chemicals could be used for that purpose.

When the Toubys were arrested, DEA agents and New Jersey police found a laboratory in their bedroom containing a plexiglass hood with heating elements, a hood ventilator which carried air from inside the hood to outside the house, at least one respirator with a cartridge, various equipment including glassware and a scale, and a pyrex dish with ephedrine, a substance commonly used to "cut" illegal drugs. The manufacture of Euphoria produces a toxic gas for which ventilation is required. Also found were some chemicals as well as a "white slab" and some white powders which, when tested by the government using four methods, were found to contain 4-methylaminorex. Other chemicals were found but were destroyed before being tested. The agents found in the bedroom four pieces of paper which, when read together, contained most of the recipe for making 4-methylaminorex.

---

5. In *Emerson*, the court noted in a footnote that the government had not relied upon or even mentioned the existence of the new regulation and the court did not consider it. 846 F.2d at 548 n. 3. In *Hovey*, the court noted that the regulation did not apply because it was promulgated after the defendant's conviction. 674 F.Supp. at 169 and n. 18.

6. We do not decide here whether a broad subdelegation of all powers vested in the Attorney General by all future statutory amendments would be valid if there were an amendment which created new and different powers.

Lyrissa Touby contends that she cannot be found to have conspired to manufacture 4-methylaminorex because she was not aware of the illegal nature of her activities and therefore did not enter into any agreement to reach an illegal goal. Her argument is based on the assertion that she and her husband had a T-shirt business, that she thought that the chemicals she picked up were for the T-shirt business, that some of the chemicals found were not related to the manufacture of 4-methylaminorex and not inconsistent with affixing designs on T-shirts, that her fingerprints and handwriting were not connected with the drug recipe or the laboratory, that she had no knowledge of the complicated chemical processes her husband was doing, and that she did not know that her husband was doing anything illegal.

However, the laboratory for making Euphoria was in her marital bedroom. The jury could reasonably infer that because the laboratory was set up in the bedroom rather than a more suitable site in the house, it was designed to be secret and that she knew it was illegal. Furthermore, there was ample evidence that the drug was actually manufactured there and that she participated in the manufacture by picking up necessary chemicals.

The cases Lyrissa Touby relies on are inapposite because they concern situations where there was no proof that the defendant knew of the existence of the drugs. See United States v. Terselich, 885 F.2d 1094 (3d Cir.1989) (insufficient evidence that passenger knew purpose of the trip was to transport drugs concealed in hidden compartment of car); United States v. Wexler, 838 F.2d 88, 92 n. 2 (3d Cir.1988) (insufficient evidence to conclude that defendant who acted as lookout for truck knew that there were drugs "behind a closed truck door which he neither drove nor rode in"). In this case, the evidence, albeit circumstantial, was sufficient to permit the jury to infer that Lyrissa Touby had the requisite knowledge of the scheme to manufacture 4-methylaminorex and knowingly participated.

## IV.

### Touby's Pro Se Arguments

In his pro se submissions, Daniel Touby takes issue with the district court's calculation for sentencing purposes of the total quantity of the drugs involved in the conspiracy to manufacture 4-methylaminorex. The Probation Office had concluded that ten kilos of Euphoria were involved and determined that the appropriate guideline base for the Toubys was 32. Touby's counsel, on the other hand, suggested a base level of 16. The district court adopted a guideline base of 18 after finding as a fact that there were sufficient ingredients in the Toubys' bedroom to manufacture 250 grams of Euphoria.[7] This finding was based in part on the presence of two bottles of cyanogen bromide and the inference that the two-thirds missing from one bottle had been used to create the 100-gram sample of Euphoria that was found, so that the remaining chemicals were sufficient to manufacture an additional 150 grams.

■ Touby argues that the 100 grams of Euphoria found in the bedroom was only 2.7% pure and that only pure Euphoria, rather than the total weight of the product, can be used in calculating the guideline base. His argument is inconsistent with the Sentencing Guidelines which provide that the base offense level of a defendant convicted of manufacturing and conspiring to manufacture scheduled drugs is determined by the quantity of drugs defendant is found to have manufactured or conspired to have manufactured. Sentencing Guidelines § 2D1.1(a)(3). The footnote to the applicable Guidelines provision indicates that "[u]nless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance." Id. at footnote, Drug Quantity Tables. See also United States v. Gur-

---

7. It is undisputed that for sentencing purposes one gram of Euphoria is equivalent to .1 gram of heroin or .5 grams of cocaine.

*giolo,* 894 F.2d 56, 60–61 (3d Cir.1990) (explaining footnote).

 Although Touby argues that 97.3% of the 100–gram slab contained other poisonous ingredients which rendered the substance inconsumable, there was no attempt to prove at trial or at the sentencing hearing that these ingredients were manufacturing by-products rather than a "cut." In fact, a government witness testified at trial that additional ingredients are often added to "cut" drugs, and defendants offered no evidence to discredit or rebut this testimony.[8] There is no basis in this record to deviate from the general rule that the total weight of the drugs should be used for determining the criminal offense level, even if a deviation were permissible.

 Daniel Touby's second argument goes to the district court's determination that his sentence should be calculated as though his criminal history category was category II. Although the pre-sentence report indicated that the Toubys had no prior convictions and thus fell within criminal history category I, the government moved for a departure from the Guidelines based on under-reported criminal history pursuant to section 4A1.3 of the Sentencing Guidelines, which provides:

> If reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range. Such information may include, but is not limited to, information concerning:
>
> . . . .
>
> (d) whether the defendant was pending trial, sentencing, or appeal on another charge at the time of the instant offense.

Sentencing Guidelines § 4A1.3. Under the commentary, if the court departs under this provision it should look to the guideline range of a defendant with a higher criminal history category. *Id.*

In determining that a departure from the Guidelines was warranted, the district court relied on information in the Preliminary Sentencing Investigation Report that the Toubys were indicted on January 18, 1988 in New Jersey on two counts of possession of a controlled dangerous substance, two counts of possession with intent to distribute, two counts of conspiracy, seven counts of forgery, four counts of uttering a forged instrument, and four counts of theft by deception. Daniel Touby pled guilty to one forgery and one theft count and both pled guilty to possession of marijuana with intent to distribute. The authorities had found five pounds of marijuana, worth $25,000, a garden containing over 50 marijuana plants, a basement set up to cultivate marijuana, and electronic balance and scale, and bags filled with marijuana.

In addition, the Toubys pled guilty in New Jersey on October 19, 1988 to counts arising from different incidents and a different indictment. Daniel Touby pled guilty to possessing 25 grams of marijuana with intent to distribute on school property, possession of drug paraphernalia with intent to distribute, and advertising and promoting drug paraphernalia. Lyrissa Touby pled guilty to possession of marijuana with intent to distribute and possession of drug paraphernalia with intent to distribute. Finally, Daniel Touby was charged on August 15, 1988 with burglary, unlawful entry, exercising unlawful control over movable property, and theft.

Even if, as Touby represented, he planned to withdraw his guilty pleas and the respective state courts would have al-

---

**8.** Daniel Touby contends that his counsel was ineffective for failure to bring to light the poisonous nature of the materials. This argument cannot be considered on this direct appeal because it was not raised at trial and there is an inadequate record with respect thereto. *See United States v. Theodoropoulos,* 866 F.2d 587, 598 (3d Cir.1989); *Government of Virgin Islands*

*v. Zepp,* 748 F.2d 125, 133–34 (3d Cir.1984). Similarly, there was no testimony at trial to support Touby's contention that he had really intended to make Eucharist, a non-scheduled substance, rather than Euphoria. In fact, his counsel made a tactical decision not to proceed along that line.

lowed the withdrawal, the Toubys would still be facing trial on the charges. As the district court noted, the Guidelines provide for an upward departure if the defendant was pending trial or sentencing on another charge at the time of the instant offense. In light of the above, we cannot conclude that the district court was unreasonable in its application of the Sentencing Guidelines. *See* 18 U.S.C.A. § 3742(f)(2) (1989).

## V.

### *Conclusion*

For the reasons set forth above, we will affirm the judgment of conviction and sentence.

HUTCHINSON, Circuit Judge, dissenting.

In this case, the Court sustains a broad delegation of Congress's core legislative power to define primary criminal conduct to the Executive's chief law enforcement officer, the Attorney General, against a facial attack on the constitutionality of that delegation. Specifically, the statute in question, 21 U.S.C. § 811(h) (1988), gives the Attorney General the power to prohibit the manufacture, use, or distribution of drugs he believes present an imminent danger to the public safety on pain of severe criminal sanctions without the independent check of either a controlling scientific and medical evaluation by a regulatory agency with expertise in the properties and effects of drugs or judicial review of the Attorney General's decision by the courts. I cannot reconcile that result with any viable version of the non-delegation doctrine, a doctrine that the Court concedes has continuing vitality, *see* Opinion of the Court, at 764, despite the dormancy of its application in recent times. *See Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 654, 102

L.Ed.2d 714 (1989).[1] I therefore respectfully dissent.

I agree with the Court that the Toubys have mounted only a facial attack on the statute limited to improper delegation, despite their statement that the statute is also invalid as applied to them. They presented no evidence, and I find none elsewhere in the record, that "euphoria" is not a danger to the public safety or that the Attorney General acted arbitrarily or otherwise improperly in temporarily scheduling it. I also accept the Court's statement of the statutory background, the nature of the problem, the facts of the case and its holding that we have jurisdiction to consider the constitutionality of this particular delegation of lawmaking power to the Attorney General. Except for its treatment of the criminal aspect of this delegation, I am likewise generally in accord with its listing of the factors for consideration in determining whether a particular delegation of legislative power is valid under Article I, § 1 of the Constitution. However, I believe the Court errs in holding that this delegation to the Attorney General is valid. In 21 U.S.C. § 811(h), Congress tells the executive branch to subject drug users to severe criminal sanctions whenever the Attorney General decides a particular new drug poses an "imminent hazard to the public safety" without independent, a priori regulatory control or a posteriori judicial review.[2] In support of its holding, the Court cites various cases upholding delegations that run afoul of some of the factors material to an analysis of the validity of legislative delegation. However, in none of those cases, nor in any that my research has uncovered, has a court upheld a statute that gives broad delegation to define primary criminal conduct to the official chiefly responsible for criminal law enforcement without either independent expert control or judicial review.

---

**1.** Because of my view that 21 U.S.C. § 811(h) is an unconstitutional delegation of legislative power to the Attorney General, I do not reach or consider the issues of sub-delegation to the Drug Enforcement Agency Administrator, Lyrissa Touby's attack on the sufficiency of the evidence, or Daniel Touby's *pro se* arguments.

**2.** The Court reserves the question of review under the text of the Fifth Amendment's Due Process Clause. *See* Opinion of the Court, at 764 n. 2. For the reasons set forth, *infra* typescript at 777–78, I do not think that this satisfactorily deals with the delegation problem.

I note first that the broad standard Congress enacted to control the Attorney General's exercise of the lawmaking power relates to the definition of criminal conduct by a law enforcement officer. Unlike the Court, I think the power to impose primary criminal sanctions is a factor to be considered when evaluating a statute under the non-delegation doctrine. The Court cites *United States v. Frank*, 864 F.2d 992 (3d Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 2442, 104 L.Ed.2d 998 (1989), for the proposition that the standard governing the delegation of the power to establish criminal penalties is no more stringent than that which governs any other delegation of lawmaking power. In my judgment, *Frank* is distinguishable. Moreover, I do not believe that the statement the Court cites from *Frank* is controlling on the relevance of primary criminal sanctions to valid delegation.

*Frank* involved a delegation of the power to limit objectively the range within which a sentence could be imposed on a person already adjudged guilty of criminal conduct within a narrower band than the broad punitive range set by the particular criminal statute involved. Our decision upholding the delegation in *Frank* was ultimately vindicated by the decision of the Supreme Court in *Mistretta*. A delegation of the power to limit the range of penalties that the government may impose upon criminal conduct defined by Congress is different than the power to define the conduct that must be shown to have occurred before any criminal penalty may be imposed. Courts have generally held that substantive criminal conduct must be precisely defined by statute. The sentencing power is different. Before the Sentencing Guidelines, the length of a sentence was left to the discretion of the sentencing court, provided only that it acted within the broad range set in the statute. *See Mistretta*, 109 S.Ct. at 650.

Aside from the fact that *Frank* is distinguishable, the construction the Court places on its statement that a majority of the Supreme Court has not shown any inclination to preclude more strictly a delegation of lawmaking power in the criminal field is contrary to the statement of the United States Supreme Court in *Fahey v. Mallonee*, 332 U.S. 245, 250, 67 S.Ct. 1552, 1554, 91 L.Ed. 2030 (1947). In *Fahey*, the Supreme Court, in upholding a delegation of the terms for which conservators could be appointed to oversee failed savings and loan associations, said that what may be allowed in connection with supervisory actions may not be allowed in the creation of new crimes, at least in uncharted fields. The field of dangerous drugs is, of course, not entirely uncharted. However, the cartographer has heretofore been the Secretary of Health and Human Services, perhaps with the Attorney General in the role of pilot. This statute gives the Attorney General both functions. In *United States v. Robel*, 389 U.S. 258, 275, 88 S.Ct. 419, 430, 19 L.Ed.2d 508 (1967), Justice Brennan, in a concurring opinion, expressly stated that "[t]he area of permissible indefiniteness [in delegation] narrows ... when the regulation invokes criminal sanctions."

Because of the difference between the delegation of the power to define sanctions for criminal conduct and the power to define the conduct that will permit those sanctions, and these statements by the Supreme Court, I do not believe the statement made in *Frank* adequately supports the Court's conclusion that there is no difference between the application of the non-delegation doctrine in the criminal field, as opposed to its application in the civil and regulatory fields. Indeed, as the Court recognizes, the only two cases that have held congressional delegation of broad legislative power constitutionally invalid involved the delegation of power to create laws that subjected the violator to criminal penalties. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935).

The Court correctly states that the Constitution does not prohibit Congress from delegating its authority to coordinate branches if it sets forth an "intelligible principle" limiting the bounds of the delegated authority. *See J.W. Hampton, Jr.*

*& Co. v. United States,* 276 U.S. 394, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928). I agree with the Court that a delegation to prohibit the use of dangerous drugs for the purpose of avoiding "an imminent hazard to the public safety" is in and of itself an intelligible principle under the teachings of the Supreme Court. *Cf. National Broadcasting Co. v. United States,* 319 U.S. 190, 225–26, 63 S.Ct. 997, 1013–14, 87 L.Ed. 1344 (1943) (upholding "public convenience, interest and necessity" as a valid basis for FCC regulations); *Lichter v. United States,* 334 U.S. 742, 783–87, 68 S.Ct. 1294, 1315–18, 92 L.Ed. 1694 (1948) (upholding "excessive profits" standard as the basis for administrative renegotiation of wartime supply contracts).

But what are we to say of the delegation to a law enforcement officer of the power to define primary criminal conduct in accordance with a broad "intelligible principle" if Congress prohibits the judiciary from determining whether the law enforcement official has acted within the limits of that principle? Congress had said that "[a]n order issued under [the temporary scheduling power] is not subject to judicial review." 21 U.S.C. § 811(h)(6). I am, of course, mindful of the maxim of statutory interpretation that a statute should be construed as constitutional if at all possible, *see Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 346–48, 56 S.Ct. 466, 482–84, 80 L.Ed. 688 (1936) (Brandeis, J., concurring), and I would so construe this statute if its language, legislative history and existing case law permitted me to do so.[3] Nevertheless, I believe that the language of § 811(h)(6) shows that Congress intended to preclude the judiciary from substantively reviewing the Attorney General's exercise of the broad discretion Congress gave him.

The language of § 811(h)(6) itself is unequivocal. It says that the Attorney General's action is "not subject to judicial review." I do not think that the strong presumption in favor of judicial review can prevail against this express preclusion. At the very least, § 811(h)(6) precludes review under the Administrative Procedure Act. Even if the language of § 811(h)(6) leaves open the question of whether an individual indicted for the manufacture, use or distribution of a substance that the Attorney General has temporarily scheduled can defend on the ground that the Attorney General acted beyond his delegated power, the history of the statute indicates that Congress had no intention to permit such a defense. The Court seems to recognize this absolute prohibition on judicial review, other than to review for due process, when it states: "Judicial review is the usual vehicle by which the executive action is tested to insure that 'the will of Congress has been obeyed.'" *See* Opinion of the Court at 768 (citing *Skinner v. Mid–America Pipeline Co.,* 490 U.S. 212, 109 S.Ct. 1726, 1731, 104 L.Ed.2d 250 (1989) (quoting *Mistretta,* 109 S.Ct. at 658)).

Recognizing the problem presented by the statute's preclusion of judicial review, the Court suggests that the implication of this prohibition on the facial validity of the statute can be avoided, and it cites some of the many cases in which some limitation on judicial review of administrative action has been upheld by the Supreme Court. None of these cases involves a delegation of the power to define primary criminal conduct, and I do not think that any of them stands for the proposition that judicial review of whether the delegee has acted within the substantive confines of the delegated power may be precluded.

*Block v. Community Nutrition Inst.,* 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984), is, in my judgment, not apposite. In *Block,* the Supreme Court held that consumers may not obtain judicial review of milk marketing orders issued by the Secretary of Agriculture. Considering the histo-

---

**3.** I am also mindful of the gravity of the drug problem in this nation and of the technical difficulty Congress faces in enacting statutes to control it in the face of illicit drug dealers' entrepreneurial and technical abilities to compound chemical escapes from reality with ever-changing formulae. Because of this, a quick and flexible law enforcement response is not only desirable, but essential. However, it is, I believe, also essential that the power of the law enforcer to define criminal conduct be subject to independent control.

ry of milk marketing, I read that case as simply holding that Congress did not intend to give consumers standing to review milk marketing orders. It is plain from the decision, the statute and the regulations themselves that judicial review of milk marketing orders issued by the Secretary of Agriculture was available to processors of dairy products. The question before the Court was not whether Congress had precluded judicial review, but whether it had afforded consumers affected by such orders standing to attack the Secretary's orders as beyond the delegated power.

In *Briscoe v. Bell*, 432 U.S. 404, 97 S.Ct. 2428, 53 L.Ed.2d 439 (1977), a statute came closer to prohibiting judicial review of whether the delegee had acted within the limits of his delegated power. In that case, the Supreme Court enforced a provision in the Voting Rights Act barring "judicial review in any court" of the Attorney General's determination that preconditions for the application of the Act to particular jurisdictions had been met. *Briscoe*, however, was not a criminal case; even so, the Court noted that review would be available under an exemption provision contained in the Act. *See id.* at 411, 97 S.Ct. at 2432.

*Johnson v. Robison*, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974), involving the preclusion of judicial review in non-constitutional attacks on the Veterans Administration's provision of benefits, is an unremarkable case. Delegation of the power to decide issues concerning veterans' benefits has been wholly entrusted to persons within the executive branch since the First Congress. *See* 1 K. Davis, *Administrative Law Treatise* 158 (2d ed. 1978).

*Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944), did involve criminal sanctions for violating price controls promulgated by the Office of Price Administration under the wartime Emergency Price Control Act. There, however, review, while strictly limited as to time, was available through the wartime Emergency Court of Appeals. No emergency court is available to review the scheduling of newly created designer drugs.

*United States v. Caudle*, 828 F.2d 1111 (5th Cir.1987), did not state the constitutional basis on which it upheld the dismissal of an indictment charging an individual with distribution of a temporarily scheduled drug because the Attorney General had not issued the order in accordance with the time limits provided in § 811(h), and the court there did not discuss limitations on the preclusion of judicial review in § 811(h)(6). *Caudle* involved the failure to follow the notice procedure that the statute requires, a procedure that certainly has due process implications. The court did not reach the question of whether the drug presented an "imminent hazard to the public safety."

The Court, citing *Estep v. United States*, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946), suggests that § 811(h)(6) does not preclude all review of the temporary scheduling power. *Estep* is distinguishable. The statutory language considered in *Estep* did not preclude judicial review, but simply made the action of the independent civilian administrative authorities "final." As Professor Jaffe points out, courts have almost uniformly refused to interpret language providing that the decisions of administrative authorities shall be "final" as precluding judicial review. While such language may affect the scope of review, it does not normally preclude it. *See* L. Jaffe, *Judicial Control of Administrative Action* 356 (1965). Thus, in *Estep*, the Court held that a draftee who faced criminal prosecution for refusing to submit to induction could raise the defense that the Draft Board's actions were lawless and outside its jurisdiction, despite a statutory provision rendering decisions of administrative authorities "final."

The precise basis for the decision in *Estep* is unclear, but Professor Jaffe suggests that it was decided upon statutory, rather than constitutional, grounds, *see id.* at 392, though perhaps with a flavor of due process. The Court seems to recognize that *Estep* is not a delegation case. Its reference to *Estep* follows its statement that: "As we have already suggested, *see supra* note 2, this does not necessarily preclude review of the application of the

temporary scheduling power in an individual case." Opinion of the Court at 768. Footnote 2 of the Court's opinion deals with due process challenges, not challenges to delegation.

Of course, I agree with the Court that Congress has not deprived the federal judiciary of jurisdiction to test the constitutionality of this statute. *See* 28 U.S.C. § 1331. But, I believe that § 811(h)'s legislative history supports the view that Congress did not intend to permit judicial review of the substantive basis for the Attorney General's temporary scheduling. Considering the breadth of the delegation, such review, even for an arbitrary and capricious failure to act within the broad limiting standard, would be likely to interfere with Congress's declared intention to deal promptly with what it saw as an emergency situation. *See* S.Rep. No. 98–225, 98th Cong., 2d Sess., 262, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3444.

The Court states that § 811(h) does not give the Attorney General power to define primary criminal conduct because Congress, not the Attorney General, defined the crime in § 812(b) by setting forth three criteria independent of § 811(h) that a Schedule I drug must meet. The § 812(b) criteria seem to me to be, at most, a direction to the Attorney General, the official charged with adding drugs to Schedule I pursuant to the power given him by § 811(h). I consider officials acting under § 811(h) secondary actors. The primary actor is the defendant, the person charged with manufacture, use or distribution of the drug. The crime for which a defendant is prosecuted is not, however, the manufacture, use or distribution of a drug that has the three characteristics Congress set forth in § 812(b). Rather, it is the manufacture, use or distribution of a drug the Attorney General has scheduled under § 811(h). If Congress had directly defined the crime in terms of the three § 812(b) criteria, each defendant charged with possession of a drug the Attorney General had scheduled would, it seems to me, be able to attack the

sufficiency of the evidence as to each of the three criteria Congress sets forth. I believe Congress did not intend to require the government to prove beyond a reasonable doubt the presence of these three factors in each case. If there were such a requirement, there would be little point in granting the Attorney General the power to schedule particular drugs.

As the Court recognizes, this is not to say that we could not review the Attorney General's actions under the Due Process Clause. However, the question before us is not due process but the intent of Congress to preclude review of the Attorney General's actions under the non-delegation doctrine. Considering the statutory prohibition against judicial review, the nature of the power delegated, the breadth of the delegation, the person to whom the delegation is made and the imprecision of the remedy afforded persons affected by a decision if the regulatory body with expertise and experience in the field concludes that the Attorney General is wrong in scheduling a particular drug, I believe that § 811(h) is facially invalid because it places no independent, a priori or a posteriori check on the Attorney General's power to define a crime. The doctrine of separation of powers that underlies our constitutional system of government seems to me to require such a check.

The prohibition against overbroad and unchecked delegation has its roots in the philosophical assumptions that caused the framers of our system of government to make a tri-partite separation of the federal government's sovereign power among the legislature, the executive and the judiciary. This separation does not promote the efficient functioning of government. It is often inconvenient, but an examination of the historical background in England and the colonies indicates to me that the framers thought that such a separation was an important safeguard of individual liberties.[4] According to Blackstone:

---

4. For an extended discussion of the historical background and the relation between the original text of the Constitution and the Bill of

Rights, see Gibbons, *Factions,* 20 Seton Hall L.Rev. 344 (1990).

In all tyrannical governments, the supreme magistracy, or the right both of making and enforcing laws is vested in one and the same man, or one and the same body of men; and wherever these two powers are united together, there can be no liberty.

1 Blackstone, *Commentaries on the Laws of England* 146 (7th ed. 1775), *quoted in* 1 K. Davis, *supra* at 777, at 68. The doctrine, rooted in separation of powers, that prohibits Congress from overbroad delegations of its legislative power resides in the original Constitution as ratified by the states. Due process has its basis in the text of the Fifth Amendment. Both are part of constitutional law.

If due process is the only basis upon which individuals can be protected from arbitrary and capricious governmental actions, there would be no point in extended discussion of the prohibition against the delegation of legislative powers. That doctrine would have no part in judging an individual case. The protection of individual rights, apart from due process, would be left to the self-interest of each of the three branches in defending its own turf against intrusion by the other two.

However, if the prohibition against delegation has any vitality, it has it apart from the Bill of Rights and the Due Process Clause that Bill includes. It is therefore no answer to a question of improper delegation to suggest that an individual affected by the scheduling of a particular drug under Schedule I as an imminent hazard to the public safety can challenge the application of the criminal prohibition to him on due process grounds. Nor is it an answer that the individual could perhaps even attack the scheduling itself as being beyond the substantive bounds of the "intelligible principle" that limits the delegated legislative power; or, alternately, that if the Attorney General's order is "vacated" the individual could have his indictment dismissed or his conviction expunged by habeas or otherwise a year or eighteen months later when the Attorney General or an independent expert authority determines that the drug on which his conviction mines that the drug on which his conviction was based was not dangerous enough to warrant its scheduling.

If this delegation is constitutional, I believe any individual protection provided by the constitutional prohibition against a general delegation of legislative power is a relic of the past. It may be that the evolution of due process as a direct guarantor of individual liberties has made the indirect assurance of the delegation doctrine and the separation of powers obsolete or unnecessary. I am, however, unwilling to consign it to the museum until the Supreme Court so decides. This Court's opinion finds the non-delegation doctrine moribund. It leaves it dead. Since this delegation is insulated from judicial review on the face of the statute, its conflict with the doctrine of the separation of powers must be decided independently of the individual's right to due process.

Other courts that have considered the question of Congress's delegation of the power to temporarily schedule on an emergency basis have expressed concern over the constitutional implications of that delegation. *See, e.g., United States v. Spain,* 825 F.2d 1426, 1429 (10th Cir.1987) ("The Congressional delegation to the Attorney General is not without doubt as to adequacy of standards in 811(h)...."). I believe that concern is well-founded. Considering the nature of the power delegated, the breadth of the delegation, the absence of substantive checks upon the Attorney General's law enforcement power and the preclusion of judicial review, I would hold that 21 U.S.C. § 811(h) is an improper delegation of legislative power violating the principle of separation of powers embodied in part in Article I, § 1 of the original text of our Constitution. That principle is designed to protect individuals against the arbitrary exercise of sovereign power by dividing it among the three branches of government that the draftsmen of the Constitution created, so that each one may check the excesses of the others, to the benefit of the individuals whose rights and tranquility the Constitution is meant to secure, not only in their daily intercourse with each other but also in their interactions with the officials to whom they have

entrusted the power to govern them. For these reasons, I would reverse the Toubys' convictions.